FILED: May 4, 2004

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 03-4792
(CR-01-455)

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

ZACARIAS MOUSSAOUI, a/k/a Shaqil, a/k/a Abu
Khalid al Sahrawi,

Defendant - Appellee.

-------------------------

CENTER FOR NATIONAL SECURITY STUDIES,

Amicus Curiae.

O R D E R

The court amends its opinion filed April 22, 2004, as follows:

On page 6, footnote 5, line 6 -- a quotation mark is added before the asterisks.

On page 18, second full paragraph, line 4, the word "exclusively" replaces "excusively."

For the Court - By Direction,

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

ZACARIAS MOUSSAOUI, a/k/a Shaqil,
a/k/a Aba Khalid al Sahrawi,
*Defendant-Appellee,*

⎞
⎟
⎬  No. 03-4792
⎟
⎠

CENTER FOR NATIONAL SECURITY
STUDIES,
*Amicus Supporting Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge. (CR-01-455)

Argued: December 3, 2003

Decided: April 22, 2004

Before WILKINS, Chief Judge, and WILLIAMS and
GREGORY, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion.
Chief Judge Wilkins announced the judgment of the court and wrote
an opinion, in which Judge Williams concurs as to Parts I, II,
IV.C.2.a. through IV.C.2.c., and V.A. through V.C., and in which
Judge Gregory concurs except as to Part V.C. Judge Williams wrote

an opinion concurring in part and dissenting in part, Judge Gregory wrote an opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Paul N. Clement, Deputy Solicitor General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Frank Willard Dunham, Jr., Federal Public Defender, Alexandria, Virginia; Edward Brian MacMahon, Jr., Middleburg, Virginia, for Appellee. **ON BRIEF:** Christopher A. Wray, Assistant Attorney General, Patrick F. Philbin, Associate Deputy Attorney General, Jonathan L. Marcus, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Paul J. McNulty, United States Attorney, Robert A. Spencer, Assistant United States Attorney, Kenneth M. Karas, Assistant United States Attorney, David J. Novak, Assistant United States Attorney, Alexandria, Virginia, for Appellant. Gerald T. Zerkin, Jr., Senior Assistant Federal Public Defender, Kenneth P. Troccoli, Assistant Federal Public Defender, Anne M. Chapman, Assistant Federal Public Defender, Alexandria, Virginia, Alan H. Yamamoto, Alexandria, Virginia, for Appellee. Kathleen Clark, Joseph Onek, CENTER FOR NATIONAL SECURITY STUDIES, Washington, D.C., for Amicus Curiae.

---

## OPINION

WILKINS, Chief Judge:

The Government appeals a series of rulings by the district court granting Appellee Zacarias Moussaoui access to certain individuals[1] ("the enemy combatant witnesses" or "the witnesses") for the purpose of deposing them pursuant to Federal Rule of Criminal Procedure 15; rejecting the Government's proposed substitutions for the depositions;

---

[1]The names of these individuals are classified, as is much of the information pertinent to this appeal. We have avoided reference to classified material to the greatest extent possible. Where classified information has been redacted, it has been noted by "* * * *."

and imposing sanctions for the Government's refusal to produce the witnesses. We are presented with questions of grave significance—questions that test the commitment of this nation to an independent judiciary, to the constitutional guarantee of a fair trial even to one accused of the most heinous of crimes, and to the protection of our citizens against additional terrorist attacks. These questions do not admit of easy answers.

For the reasons set forth below, we reject the Government's claim that the district court exceeded its authority in granting Moussaoui access to the witnesses. We affirm the conclusion of the district court that the enemy combatant witnesses could provide material, favorable testimony on Moussaoui's behalf, and we agree with the district court that the Government's proposed substitutions for the witnesses' deposition testimony are inadequate. However, we reverse the district court insofar as it held that it is not possible to craft adequate substitutions, and we remand with instructions for the district court and the parties to craft substitutions under certain guidelines. Finally, we vacate the order imposing sanctions on the Government.

## I.

### A.  *Background Information*

On September 11, 2001, members of the terrorist organization al Qaeda[2] hijacked three passenger aircraft and crashed them into the Pentagon and the World Trade Center towers in New York. A fourth plane, apparently destined for the United States Capitol, crashed in Pennsylvania after passengers wrested control from the hijackers. The attacks resulted in the deaths of over 3000 men, women, and children.

Moussaoui was arrested for an immigration violation in mid-August 2001 and, in December of that year, was indicted on several charges of conspiracy related to the September 11 attacks. In July 2002, the Government filed a superseding indictment charging Moussaoui with six offenses: conspiracy to commit acts of terrorism tran-

---

[2]The name "al Qaeda" is transliterated from Arabic. Several spellings may be acceptable for transliterated terms; this opinion adopts the spelling conventions employed by the district court and the parties.

scending national boundaries, *see* 18 U.S.C.A. § 2332b(a)(2), (c) (West 2000); conspiracy to commit aircraft piracy, *see* 49 U.S.C.A. § 46502(a)(1)(A), (a)(2)(B) (West 1997); conspiracy to destroy aircraft, *see* 18 U.S.C.A. §§ 32(a)(7), 34 (West 2000); conspiracy to use weapons of mass destruction, *see* 18 U.S.C.A. § 2332a(a) (West 2000 & Supp. 2003); conspiracy to murder United States employees, *see* 18 U.S.C.A. §§ 1114, 1117 (West 2000 & Supp. 2003), and conspiracy to destroy property, *see* 18 U.S.C.A. § 844(f), (i), (n) (West 2000 & Supp. 2003). The Government seeks the death penalty on the first four of these charges.

According to the allegations of the indictment, Moussaoui was present at an al Qaeda training camp in April 1998. The indictment further alleges that Moussaoui arrived in the United States in late February 2001 and thereafter began flight lessons in Norman, Oklahoma. Other allegations in the indictment highlight similarities between Moussaoui's conduct and the conduct of the September 11 hijackers. Each of the four death-eligible counts of the indictment alleges that the actions of Moussaoui and his coconspirators "result[ed] in the deaths of thousands of persons on September 11, 2001." *E.g.,* J.A. (03-4162) 108.[3]

## B.  *Events Leading to this Appeal*

Simultaneously with its prosecution of Moussaoui, the Executive Branch has been engaged in ongoing efforts to eradicate al Qaeda and to capture its leader, Usama bin Laden. These efforts have resulted in the capture of numerous members of al Qaeda, including the witnesses at issue here: * * * *.

---

[3]The materials before us include numerous joint appendices from both this and the previous appeal. We will cite such materials as follows. An appendix will be cited either J.A., to denote an unclassified appendix, or J.A.C., to denote a classified appendix. This designation will be followed by a parenthetical reference to the docket number of the appeal to which the appendix relates. For example, a reference to page 26 of the unclassified joint appendix from the previous appeal would be denoted "J.A. (03-4162) 26"; a reference to page 300 of the classified appendix from the current appeal would be denoted "J.A.C. (03-4792) 300." References to supplemental appendices will include the designation "Supp."—for example, "Supp. J.A.C. (03-4162) 25."

Witness * * * * was captured * * * *. * * * *, Moussaoui (who at that time was representing himself in the district court) moved for access to Witness * * * *, asserting that the witness would be an important part of his defense. * * * * The Government opposed this request.[4]

The district court conducted a hearing, after which it issued an oral ruling granting access to Witness * * * * ("the January 30 order"). The court subsequently issued a memorandum opinion explaining its ruling in greater detail. The district court concluded that Witness * * * * could offer material testimony in Moussaoui's defense; in particular, the court determined that Witness * * * * had * * * * knowledge of the September 11 plot and that his testimony would support Moussaoui's claim that he was not involved in the attacks. At a minimum, the court observed, Witness * * * * testimony could support an argument that Moussaoui should not receive the death penalty if convicted.

The district court acknowledged that Witness * * * * is a national security asset and therefore denied standby counsel's request for unmonitored pretrial access and declined to order his production at trial. The court also determined, however, that the Government's national security interest must yield to Moussaoui's right to a fair trial. Accordingly, the court ordered that Witness * * * * testimony be preserved by means of a Rule 15 deposition. *See* Fed. R. Crim. P. 15(a)(1) (providing that court may order deposition of witness to preserve testimony for trial "because of exceptional circumstances and in the interest of justice"). In an attempt to minimize the effect of its order on national security, the district court ordered that certain precautions be taken. Specifically, the court directed that the deposition would be taken by remote video, with Witness * * * * in an undisclosed location and Moussaoui, standby counsel, and counsel for the Government in the presence of the district court. * * * *.

---

[4]Moussaoui and standby counsel also sought access to other al Qaeda members accused of complicity in the 9/11 attacks. The district court denied these requests on the basis that Moussaoui and standby counsel had failed to demonstrate that these individuals could provide material, admissible testimony. Those rulings are not before us.

While the Government's appeal of the January 30 order was pending before this court, we remanded for the purpose of allowing the district court to determine whether any substitution existed that would place Moussaoui in substantially the same position as would a deposition. On remand, both the Government and standby counsel offered proposed substitutions for Witness * * * * deposition testimony.[5] The district court rejected the Government's proposed substitutions, reasoning that (a) the information in the * * * * reports was unreliable, and (b) the substitutions themselves were flawed in numerous respects. Believing itself bound to consider only the Government's proposed substitutions, the district court did not review the substitutions offered by standby counsel.

The proceedings on remand complete, we conducted oral argument on June 3, 2003. Shortly thereafter, we dismissed the appeal as interlocutory. *See United States v. Moussaoui* (*Moussaoui I*), 333 F.3d 509, 517 (4th Cir. 2003). Upon receiving the mandate of this court, the district court entered an order directing the Government to inform the court whether it would comply with the January 30 order. On July 14, 2003, the Government filed a pleading indicating that it would refuse to provide access to Witness * * * * for the purpose of conducting a deposition.

On August 29, the district court entered an order ("the August 29 order") granting access to Witnesses * * * * for purposes of conducting Rule 15 depositions of those witnesses. The order imposed the same conditions as those applicable to Witness * * * *. The court also directed the Government to file any proposed substitutions for the witnesses' testimony by September 5, and it directed standby counsel to file any response to the substitutions by September 12.

---

[5]These substitutions were derived as follows. * * * * These highly classified reports are intended for use in the military and intelligence communities; they were not prepared with this litigation in mind. Portions of the * * * * reports concerning Moussaoui and the September 11 attacks have been excerpted and set forth in documents prepared for purposes of this litigation. These documents, deemed " * * * * summaries" by the parties and the district court, have been provided to defense counsel in conformance with the Government's obligations under *Brady v. Maryland*, 373 U.S. 63 (1963). The proposed substitutions are based on * * * * summaries.

On September 8, the district court rejected the Government's proposed substitutions without requiring any response from the defense. The court stated that the Government's proposed substitutions for the deposition testimony of Witnesses * * * * failed for the same reasons as the Government's proposed substitutions for the deposition testimony of Witness * * * *. Following the rejection of its proposed substitutions, the Government informed the court that it would not comply with the August 29 order.

The district court then directed the parties to submit briefs concerning the appropriate sanction to be imposed for the Government's refusal to comply with the January 30 and August 29 orders. Standby counsel sought dismissal but alternatively asked the district court to dismiss the death notice. The Government filed a responsive pleading stating that "[t]o present the issue most efficiently to the Court of Appeals, and because [the Classified Information Procedures Act] prescribes dismissal as the presumptive action a district court must take in these circumstances, we do not oppose standby counsel's suggestion that the appropriate action in this case is to dismiss the indictment." J.A.C. (03-4792) 487; *see id.* (asserting that "dismissal of the indictment . . . is the surest route for ensuring that the questions at issue here can promptly be presented to the Fourth Circuit").

Noting that "[t]he unprecedented investment of both human and material resources in this case mandates the careful consideration of some sanction other than dismissal," J.A. (03-4792) 319, the district court rejected the parties' claims that the indictment should be dismissed. Rather, the court dismissed the death notice, reasoning that Moussaoui had adequately demonstrated that the witnesses could provide testimony that, if believed, might preclude a jury from finding Moussaoui eligible for the death penalty. Further, because proof of Moussaoui's involvement in the September 11 attacks was not necessary to a conviction, and because the witnesses' testimony, if believed, could exonerate Moussaoui of involvement in those attacks, the district court prohibited the Government "from making any argument, or offering any evidence, suggesting that the defendant had any involvement in, or knowledge of, the September 11 attacks." *Id.* at 327. In conjunction with this ruling, the district court denied the Government's motions to admit into evidence cockpit voice recordings

made on September 11; video footage of the collapse of the World Trade Center towers; and photographs of the victims of the attacks.

The Government now appeals, attacking multiple aspects of the rulings of the district court.[6]

## II.

Before turning to the merits, we consider the preliminary question of our jurisdiction. The parties do not dispute that we have jurisdiction over the present appeal. Nevertheless, because this is an interlocutory appeal, and in view of our prior dismissal for lack of an appealable order, we will examine the question. *See Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 635 (4th Cir.), *cert. denied*, 537 U.S. 1087 (2002).

In the previous appeal, we concluded that we lacked jurisdiction because (1) the Classified Information Procedures Act (CIPA), 18 U.S.C.A. App. 3 §§ 1-16 (West 2000 & Supp. 2003)—§ 7(a) of which authorizes an interlocutory appeal from certain orders of the district court regarding the disclosure of classified information—did not apply; (2) the order of the district court was not a collateral order appealable under *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949); and (3) mandamus jurisdiction was not appropriate. In the present appeal, the Government asserts that this court has jurisdiction pursuant to CIPA, the collateral order doctrine, and 18 U.S.C.A. § 3731 (West Supp. 2003). Because we conclude that jurisdiction for this appeal lies under § 3731, we need not address the Government's other proposed bases for jurisdiction.

Section 3731 allows the Government to pursue an interlocutory appeal of certain pretrial rulings of the district court in a criminal case. The first paragraph of § 3731 provides, in pertinent part, that

---

[6]Shortly before we heard oral argument on this appeal, the district court vacated its order granting Moussaoui's request to represent himself and appointed standby counsel as counsel of record. Accordingly, for the remainder of this opinion we will follow our usual practice and refer to Moussaoui and his attorneys collectively as "Moussaoui," except where necessary for the sake of clarity.

"[i]n a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information . . . as to any one or more counts, or any part thereof." 18 U.S.C.A. § 3731. The second paragraph of the statute allows the United States to appeal a pretrial order suppressing or excluding evidence, provided "the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." *Id.* Section 3731 requires courts to construe its provisions "liberally" in order "to effectuate its purposes." *Id.*; *see United States v. Wilson*, 420 U.S. 332, 337-39 (1975) (holding that, in enacting § 3731, Congress intended to remove all barriers to a Government appeal in a criminal case other than those imposed by the Constitution).

The district court sanctioned the Government for refusing to produce the enemy combatant witnesses for depositions by dismissing the death notice and excluding specific items of evidence. Both aspects of the sanction are appealable under § 3731—the latter under the text of the statute itself, and the former by liberal construction of the term "dismissing." *See United States v. Quinones*, 313 F.3d 49, 56-57 (2d Cir. 2002) (holding dismissal of death notice appealable under § 3731), *cert. denied*, 124 S. Ct. 807 (2003); *United States v. Bass*, 266 F.3d 532, 535-36 (6th Cir. 2001) (same), *rev'd on other grounds*, 536 U.S. 862 (2002) (per curiam); *United States v. Acosta-Martinez*, 252 F.3d 13, 16-17 (1st Cir. 2001) (same); *United States v. Cheely*, 36 F.3d 1439, 1441 (9th Cir. 1994) (same).

### III.

With respect to the merits, the Government first argues that the district court erred in ordering the production of the enemy combatant witnesses for the purpose of deposing them. Within the context of this argument, the Government makes two related claims. First, the Government asserts that because the witnesses are noncitizens outside the territorial boundaries of the United States, there is no means by which the district court can compel their appearance on Moussaoui's behalf. Second, the Government maintains that even if the district court has the power to reach the witnesses, its exercise of that power is curtailed by the reality that the witnesses are in military custody in time

of war, and thus requiring them to be produced would violate constitutional principles of separation of powers. We address these arguments seriatim.

### A.   *Process Power*

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The compulsory process right is circumscribed, however, by the ability of the district court to obtain the presence of a witness through service of process. *See United States v. Greco*, 298 F.2d 247, 251 (2d Cir. 1962) ("[T]he Sixth Amendment can give the right to compulsory process only where it is within the power of the federal government to provide it."). The Government maintains that because the enemy combatant witnesses are foreign nationals outside the boundaries of the United States, they are beyond the process power of the district court and, hence, unavailable to Moussaoui.

The Government's argument rests primarily on the well established and undisputed principle that the process power of the district court does not extend to foreign nationals abroad. *See United States v. Theresius Filippi*, 918 F.2d 244, 246 n.2 (1st Cir. 1990) ("The United States has no subpoena power over a foreign national in a foreign country."). Were this the governing rule, Moussaoui clearly would have no claim under the Sixth Amendment. *See United States v. Zabaneh*, 837 F.2d 1249, 1259-60 (5th Cir. 1988) ("It is well established . . . that convictions are not unconstitutional under the Sixth Amendment even though the United States courts lack power to subpoena witnesses, (other than American citizens) from foreign countries."). This is not the controlling principle, however.

The Government's argument overlooks the critical fact that the enemy combatant witnesses are in the custody of an official of the United States Government.[7] Therefore, we are concerned not with the

---

[7]The Government will neither confirm nor deny that the witnesses are in United States custody. However, it concedes, and we agree, that for purposes of this appeal we must assume that the witnesses are in United States custody.

ability of the district court to issue a subpoena to the witnesses, but rather with its power to issue a writ of habeas corpus *ad testificandum* ("testimonial writ") to the witnesses' custodian. *See* 28 U.S.C.A. § 2241(c)(5) (West 1994); *United States v. Cruz-Jiminez*, 517 F.2d 95, 99-100 (3d Cir. 1992) (explaining that when a defendant asserts a Sixth Amendment right to the testimony of an incarcerated witness, the district court may obtain the witness' testimony by issuing a testimonial writ).

In determining whether a district court possesses the power to serve a writ of habeas corpus, the critical principle is that the writ is served not upon the prisoner, but upon the custodian. *See Braden v. 30th Jud. Cir. Ct.*, 410 U.S. 484, 494-95 (1973) ("The writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in . . . custody."). As the Supreme Court has noted, "The important fact to be observed in regard to the mode of procedure upon this writ is, that it is directed to, and served upon, not the person confined, but his jailer. It does not reach the former except through the latter." *Ex Parte Endo*, 323 U.S. 283, 306 (1944) (internal quotation marks omitted); *see* 28 U.S.C.A. § 2243 (West 1994) (providing that a writ of habeas corpus "shall be directed to the person having custody of the person detained"). Therefore, the relevant question is not whether the district court can serve the *witnesses*, but rather whether the court can serve the *custodian*.[8]

---

[8]At oral argument, the Government described the capture of the enemy combatant witnesses as "a windfall" from which Moussaoui should not be entitled to benefit. We agree with the Government's premise; there can be no doubt that, were it not for the capture of these witnesses, Moussaoui could have no hope of obtaining their testimony. It does not follow, however, that this fortuity should not inure to Moussaoui's benefit. Indeed, the Government acknowledged that if the witnesses were brought to the United States for reasons unrelated to Moussaoui's prosecution, the district court would have the power to order their production. We are unable to discern why Moussaoui should be entitled to the benefit of the second windfall but not the first.

We also think that the Government's "windfall" argument mistakenly focuses on the ability of the district court to serve process on the *witnesses*, rather than on the custodian. The district court has never had—and does not now have—the power to serve process on the witnesses. But, as explained in Part III.B, the district court has always had the power to serve process on the custodian, and the existence of that power is not affected by the fact that the custodian now has the enemy combatant witnesses within his charge.

## B.  *Person to be Served*

There can be no question that the district court possesses the power to serve process on the witnesses' custodian. Although the witnesses' immediate custodian is unknown, *cf. Henderson v. INS*, 157 F.3d 106, 122 (2d Cir. 1998) (noting that a writ of habeas corpus is ordinarily served on "the individual with day-to-day control over" the prisoner), it would appear—at least the Government has not disputed—that the witnesses are in military custody. Therefore, Secretary of Defense Donald Rumsfeld is their ultimate custodian. The Second Circuit has recently concluded that an enemy combatant detained in a naval brig outside the territorial jurisdiction of the district court properly named Secretary Rumsfeld as respondent in light of the Secretary's "unprecedented" level of personal involvement with the petitioner's detention. *Padilla v. Rumsfeld*, 352 F.3d 695, 709 (2d Cir. 2003), *cert. granted*, 124 S. Ct. 1353 (2004). We lack the record evidence of Secretary Rumsfeld's personal involvement that the *Padilla* court found persuasive. Nevertheless, the Government argues that the witnesses are of vital import to the war effort and to national security. Under these circumstances, it is reasonable to believe that Secretary Rumsfeld is closely involved in their detention * * * *. Therefore, Secretary Rumsfeld—who is indisputably within the process power of the district court—is a proper recipient of a testimonial writ directing production of the witnesses.[9]

Even if it were necessary for the writ to be served upon the witnesses' immediate custodian, who is in a foreign country, the district court would have the power to serve the writ. In arguing otherwise, the Government points to the language of 28 U.S.C.A. § 2241(a) (West 1994)—which provides that district courts may issue writs of habeas corpus "within their respective jurisdictions"—and notes that in *Johnson v. Eisentrager*, 339 U.S. 763, 781-83 (1950), the Supreme Court held that the writ of habeas corpus *ad subjiciendum* ("the Great Writ") did not extend to enemy aliens held abroad. Based upon the language of § 2241 and *Johnson*, the Government contends that the process power of the district court does not extend overseas.

---

[9] * * * *.

This argument is premised on the assumption that territorial limitations applicable to the Great Writ also apply to the lesser writs. This assumption is incorrect. In *Carbo v. United States*, 364 U.S. 611 (1961), the Supreme Court considered the question of whether the writ of habeas corpus *ad prosequendum* ("prosecutorial writ") applied extraterritorially. The Court traced the different histories of the Great Writ and the testimonial and prosecutorial writs, noting that the statutory authority to issue the Great Writ had been territorially limited since at least 1875. *See id.* at 614-18. In contrast, the prosecutorial writ (authority for which derived from a different statutory provision) existed for the purpose of bringing a defendant into a jurisdiction for prosecution and thus was not traditionally territorially limited. *See id.* The Court concluded that while these distinctions were erased when Congress enacted § 2241, Congress did not intend to abandon them. *See Carbo*, 364 U.S. at 620. The Court therefore concluded that the prosecutorial writ may issue extraterritorially. *See id.* at 621.

Although the *Carbo* Court explicitly left the question open, its reasoning applies equally to the testimonial writ. *See Muhammad v. Warden*, 849 F.2d 107, 114 (4th Cir. 1988). It is thus clear that a district court can reach beyond the boundaries of its own district in order to issue a testimonial writ.

## IV.

The Government next argues that even if the district court would otherwise have the power to order the production of the witnesses, the January 30 and August 29 orders are improper because they infringe on the Executive's warmaking authority, in violation of separation of powers principles.[10]

---

[10]Moussaoui asserts that we should not consider this argument because any conflict between the Government's interests and Moussaoui's is of the Government's making. There is no question that the Government cannot invoke national security concerns as a means of depriving Moussaoui of a fair trial. That is not what the Government is attempting to do, however. The Government's claim is that separation of powers principles place the enemy combatant witnesses beyond the reach of the district court. If that is so (although we ultimately conclude it is not), then Moussaoui would not have an enforceable Sixth Amendment right to the witnesses' testimony.

A.   *Immunity Cases*

We begin by examining the Government's and Judge Williams' reliance on cases concerning governmental refusal to grant immunity to potential defense witnesses. The Government argues that these cases stand for the proposition that the district court may be precluded from issuing certain orders that implicate the separation of powers. We reject this characterization of these cases.

The "Self-Incrimination Clause of the Fifth Amendment guarantees that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Withrow v. Williams*, 507 U.S. 680, 688 (1993) (quoting U.S. Const. amend. V). Nothing in the Fifth Amendment, or in any other constitutional provision, provides a means for overcoming this privilege once a potential witness has invoked it. *See, e.g., United States v. Lenz*, 616 F.2d 960, 962 (6th Cir. 1980). However, through the Immunity of Witnesses Act, 18 U.S.C.A. §§ 6001-6005 (West 2000 & Supp. 2003), Congress has conferred upon the Attorney General statutory authority to grant use immunity to witnesses in order to obtain their testimony at trial. *See generally Kastigar v. United States*, 406 U.S. 441, 446 (1972) (explaining that immunity statutes "seek a rational accommodation between the imperatives of the [Fifth Amendment] privilege and the legitimate demands of government to compel citizens to testify"). The Immunity Act grants the Attorney General or his designee exclusive authority and discretion to confer immunity. *See* 18 U.S.C.A. § 6003(b); *United States v. Washington*, 318 F.3d 845, 855 (8th Cir.), *cert. denied*, 124 S. Ct. 209, 251 (2003).

The circuit courts, including the Fourth Circuit, have uniformly held that district courts do not have any authority to grant immunity, even when a grant of immunity would allow a defendant to present material, favorable testimony. *See, e.g., United States v. Bowling*, 239 F.3d 973, 976 (8th Cir. 2001); *United States v. Abbas*, 74 F.3d 506, 511-12 (4th Cir. 1996); *Lenz*, 616 F.2d at 962. These holdings have been based on the facts that no power to grant immunity is found in the Constitution and that Congress reserved the statutory immunity power to the Attorney General. *Cf. Earl v. United States*, 361 F.2d 531, 534 (D.C. Cir. 1966) (observing, in an opinion by then-Circuit Judge Warren Burger, that the power to grant immunity "is one of the

highest forms of discretion conferred by Congress on the Executive" and cannot be assumed by the judiciary). Because a district court has no power to grant immunity to compel the testimony of a potential witness who has invoked the privilege against self-incrimination, a defendant has no Sixth Amendment right to such testimony. *See United States v. Turkish*, 623 F.2d 769, 773-74 (2d Cir. 1980) ("Traditionally, the Sixth Amendment's Compulsory Process Clause gives the defendant the right to bring his witness to court and have the witness's non-privileged testimony heard, but does no[t] carry with it the additional right to displace a proper claim of privilege, including the privilege against self-incrimination.").

The circuits are divided with respect to the question of whether a district court can ever compel the government, on pain of dismissal, to grant immunity to a potential defense witness. *Compare United States v. Mackey*, 117 F.3d 24, 27 (1st Cir. 1997) (stating that "in certain extreme cases of prosecutorial misconduct," government's refusal to grant immunity may justify dismissal of prosecution); *United States v. Westerdahl*, 945 F.2d 1083, 1086 (9th Cir. 1991) (court may compel government to grant immunity to potential defense witness when "the fact-finding process is intentionally distorted by prosecutorial misconduct"); *Blissett v. Lefevre*, 924 F.2d 434, 441-42 (2d Cir. 1991) ( "[A] trial court should order the prosecutor to grant a defense witness immunity only in extraordinary circumstances."), *and United States v. Frans*, 697 F.2d 188, 191 (7th Cir. 1983) ("[W]e have implied that review [of refusal to grant immunity] may be proper if there is a clear abuse of discretion violating the due process clause."), *with Bowling*, 239 F.3d at 976-77 (holding that district court has no authority to compel government to grant immunity); *cf. United States v. Talley*, 164 F.3d 989, 997 (6th Cir. 1999)(noting that the Sixth Circuit has not yet decided whether, and under what circumstances, a district court could compel the government to grant immunity to a potential witness); *Autry v. Estelle*, 706 F.2d 1394, 1401 (5th Cir. 1983) (leaving open possibility that compelled grant of immunity may be justified by prosecutorial misconduct). The Fourth Circuit, consistent with the majority rule, has held that a district court may compel the government to grant immunity upon a showing of prosecutorial misconduct and materiality. *See Abbas*, 74 F.3d at 512.

Courts have noted that compelling the prosecution to grant immunity implicates the separation of powers.[11] *See, e.g., Turkish*, 623 F.2d at 775-76. Decisions to grant or deny immunity are intimately tied to decisions regarding which perpetrators of crimes will be prosecuted, a core aspect of the Executive's duty to enforce the laws. *See United States v. Pennell*, 737 F.2d 521, 528 (6th Cir. 1984). On a related note, a grant of immunity creates substantial burdens on the Executive's ability to prosecute the witness. Prosecuting a previously immunized witness requires the government to bear the "heavy burden" of proving that the prosecution does not rest on immunized testimony. *Turkish*, 623 F.2d at 775 (internal quotation marks omitted). Further, "awareness of the obstacles to successful prosecution of an immunized witness may force the prosecution to curtail its cross-examination of the witness in the case on trial to narrow the scope of the testimony that the witness will later claim tainted his subsequent prosecution." *Id.*

The Government claims that these "immunity cases" stand for the proposition that, under certain circumstances, legitimate separation of powers concerns effectively insulate the Government from being compelled to produce evidence or witnesses. In fact, the majority rule and the law of this circuit stand for precisely the opposite proposition, namely, that courts *will* compel a grant of immunity, *despite the existence of separation of powers concerns*, when the defendant demonstrates that the Government's refusal to grant immunity to an essential defense witness constitutes an abuse of the discretion granted to the Government by the Immunity Act. A showing of misconduct is necessary because, as explained above, a defendant has no Sixth Amendment right to the testimony of a potential witness who has invoked the Fifth Amendment right against self-incrimination; therefore, the defendant has no Sixth Amendment right that could outweigh the Government's interest in using its immunity power sparingly. Governmental abuse of the immunity power, however, vitiates this interest because when the Government's misconduct threatens to impair the defendant's right to a fair trial, it is proper for the district court

---

[11]There is also a concern that the opportunity to compel the government to grant immunity may induce "cooperative perjury among law violators." *Turkish*, 623 F.2d at 775.

to protect that right by compelling the Government to immunize the witness.

For these reasons, the analogy between this case and the immunity cases is inapt. The witnesses at issue here, unlike potential witnesses who have invoked their Fifth Amendment rights, are within the process power of the district court, and Moussaoui therefore has a Sixth Amendment right to their testimony. As discussed below, this right must be balanced against the Government's legitimate interest in preventing disruption of its detention * * * * of the enemy combatant witnesses.

### B.   *Governing Principles*

The concept that the various forms of governmental power—legislative, executive, and judicial—should be exercised by different bodies predates the Constitution. *See Loving v. United States*, 517 U.S. 748, 756 (1996) (citing Montesquieu, *The Spirit of the Laws*, 151-52 (Thomas Nugent trans., 1949), and 1 William Blackstone, *Commentaries* \*146-\*147, \*269-\*270). The alternative, "[t]he accumulation of all powers legislative, executive and judiciary in the same hands, . . . may justly be pronounced the very definition of tyranny." *The Federalist* No. 47, at 244 (James Madison) (Gary Wills ed., 1982). "The principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted in Philadelphia in the summer of 1787." *Buckley v. Valeo*, 424 U.S. 1, 124 (1976) (per curiam); *see INS v. Chadha*, 462 U.S. 919, 946 (1983) ("The very structure of the Articles delegating and separating powers under Arts. I, II, and III exemplifies the concept of separation of powers . . . ."). And, the Supreme Court "consistently has given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." *Mistretta v. United States*, 458 U.S. 361, 380 (1989).

Separation of powers does not mean, however, that each branch is prohibited from any activity that might have an impact on another. *See The Federalist* No. 47, at 245 (James Madison) (explaining that separation of powers does not mean that the branches "ought to have

no partial agency in, or no controul over the acts of each other," but rather means "that where the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free constitution, are subverted" (emphasis omitted)). "[A] hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively." *Buckley*, 424 U.S. at 121. Indeed, the Supreme Court has observed that "even quite burdensome interactions" between the judiciary and the Executive do not "necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions." *Clinton v. Jones*, 520 U.S. 681, 702 (1997). One example of permissible but burdensome interaction is judicial review of official Executive conduct. *See id.* at 703.

Stated in its simplest terms, the separation of powers doctrine prohibits each branch of the government from "intru[ding] upon the central prerogatives of another." *Loving*, 517 U.S. at 757. Such an intrusion occurs when one branch arrogates to itself powers constitutionally assigned to another branch or when the otherwise legitimate actions of one branch impair the functions of another. *See id.*; *see also Clinton*, 520 U.S. at 701-02.

This is not a case involving arrogation of the powers or duties of another branch. The district court orders requiring production of the enemy combatant witnesses involved the resolution of questions properly—indeed, exclusively—reserved to the judiciary. Therefore, if there is a separation of powers problem at all, it arises only from the burden the actions of the district court place on the Executive's performance of its duties. *See Clinton*, 520 U.S. at 701-06 (addressing claim that separation of powers principles barred "an otherwise traditional exercise of judicial power" that would "impose an unacceptable burden on the President's time and energy, and thereby impair the effective performance of his office").

The Supreme Court has explained on several occasions that determining whether a judicial act places impermissible burdens on another branch of government requires balancing the competing interests. *See, e.g., Nixon v. Admin'r of Gen. Servs.*, 433 U.S. 425, 443 (1977). In a case concerning the extent of the President's executive

immunity, the Supreme Court noted that "[c]ourts traditionally have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint.") *Nixon v. Fitzgerald*, 457 U.S. 731, 753 (1982). The Court continued,

> It is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States. But our cases also have established that a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch.

*Id*. at 753-54 (citations & footnote omitted).

### C.  *Balancing*

#### 1.  *The Burden on the Government*

The Constitution charges the Congress and the Executive with the making and conduct of war. *See* U.S. Const. art. I, § 8, cl. 11-16 (setting forth Congress' war powers); *id*. art. II, § 2, cl. 1 (providing that "[t]he President shall be Commander in Chief of the Army and Navy of the United States"); *Hamdi v. Rumsfeld (Hamdi II)*, 296 F.3d 278, 281 (4th Cir. 2002). It is not an exaggeration to state that the effective performance of these duties is essential to our continued existence as a sovereign nation. Indeed, "no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981); *see Hamdi II*, 296 F.3d at 283 (observing, in the post-September 11 context, that "government has no more profound responsibility than the protection of Americans . . . against additional unprovoked attack"). Thus, "[i]n accordance with [the] constitutional text, the Supreme Court has shown great deference to the political branches when called upon to decide cases implicating sensitive matters of foreign policy, national security, or military affairs." *Hamdi II*, 296 F.3d at 281.

The Government alleges—and we accept as true—that * * * * the enemy combatant witnesses is critical to the ongoing effort to combat

terrorism by al Qaeda. The witnesses are al Qaeda operatives * * * * Their value as intelligence sources can hardly be overstated. And, we must defer to the Government's assertion that interruption * * * * will have devastating effects on the ability to gather information from them. *Cf. CIA v. Sims*, 471 U.S. 159, 176 (1985) (noting that "whether an intelligence source will be harmed if his identity is revealed will often require complex political, historical, and psychological judgments" that courts are poorly equipped to make). * * * *, it is not unreasonable to suppose that interruption * * * * could result in the loss of information that might prevent future terrorist attacks.

The Government also asserts that production of the witnesses would burden the Executive's ability to conduct foreign relations. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936) ("In this vast external realm, . . . the President alone has the power to speak or listen as a representative of the nation."). The Government claims that if the Executive's assurances of confidentiality can be abrogated by the judiciary, the vital ability to obtain the cooperation of other governments will be devastated.

The Government also reminds us of the bolstering effect production of the witnesses might have on our enemies. In *Johnson*, the Supreme Court considered the question of whether enemy aliens, captured and detained abroad, should be able to assert Fifth Amendment claims by means of a petition for the Great Writ. *See Johnson*, 339 U.S. at 767. In rejecting this claim, the Court noted that issuance of the writ to enemy aliens would not only impose direct burdens on military commanders, but would also bolster the enemy in a manner inimical to the war effort:

> A basic consideration in *habeas corpus* practice is that the prisoner will be produced before the court. . . . To grant the writ to these prisoners might mean that our army must transport them across the seas for hearing. This would require allocation of shipping space, guarding personnel, billeting and rations. . . . The writ, since it is held to be a matter of right, would be equally available to enemies during active hostilities as in the present twilight between war and peace. Such trials would hamper the war effort and bring aid and comfort to the enemy. They would diminish the prestige of

our commanders, not only with enemies but with wavering neutrals. It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home. Nor is it unlikely that the result of such enemy litigiousness would be a conflict between judicial and military opinion highly comforting to enemies of the United States.

*Id*. at 778-79. Although the concerns expressed in *Johnson* do not exactly translate to the present context, the Government asserts that they are nevertheless relevant. For example, al Qaeda operatives are trained to disrupt the legal process in whatever manner possible; indications that such techniques may be successful will only cause a redoubling of their efforts.

In summary, the burdens that would arise from production of the enemy combatant witnesses are substantial.

### 2. *Moussaoui's Interest*

The importance of the Sixth Amendment right to compulsory process is not subject to question—it is integral to our adversarial criminal justice system:

> The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of the courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

*United States v. Nixon*, 418 U.S. 683, 709 (1974); *see Washington v. Texas*, 388 U.S. 14, 19 (1967) ("The right to offer the testimony of

witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense."). *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

The compulsory process right does not attach to any witness the defendant wishes to call, however. Rather, a defendant must demonstrate that the witness he desires to have produced would testify "in his favor." U.S. Const. amend. VI; *see United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). Thus, in order to assess Moussaoui's interest, we must determine whether the enemy combatant witnesses could provide testimony material to Moussaoui's defense.

In the CIPA context,[12] we have adopted the standard articulated by the Supreme Court in *Roviaro v. United States*, 353 U.S. 53 (1957), for determining whether the government's privilege in classified information must give way. *See United States v. Smith*, 780 F.2d 1102, 1107-10 (4th Cir. 1985) (en banc). Under that standard, a defendant becomes entitled to disclosure of classified information upon a showing that the information "'is relevant and helpful to the defense . . . or is essential to a fair determination of a cause.'" *Id.* at 1107 (quoting *Roviaro*, 353 U.S. at 60-61); *see United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990) (explaining that "*Smith* requires the admission of classified information" once the defendant has satisfied the Roviaro standard).

Because Moussaoui has not had—and will not receive—direct access to any of the witnesses, he cannot be required to show materiality with the degree of specificity that applies in the ordinary case. *See Valenzuela-Bernal*, 458 U.S. at 870-71, 873. Rather, it is suffi-

---

[12]We adhere to our prior ruling that CIPA does not apply because the January 30 and August 29 orders of the district court are not covered by either of the potentially relevant provisions of CIPA: § 4 (concerning deletion of classified information from *documents* to be turned over to the defendant during discovery) or § 6 (concerning the disclosure of classified information by the defense during pretrial or trial proceedings). *See Moussaoui I*, 333 F.3d at 514-15. Like the district court, however, we believe that CIPA provides a useful framework for considering the questions raised by Moussaoui's request for access to the enemy combatant witnesses.

cient if Moussaoui can make a "plausible showing" of materiality. *Id.* at 873; *cf. id.* at 871 (noting that a defendant who has not interviewed a potential witness may demonstrate materiality by relating "the events to which a witness might testify[ ] and the relevance of those events to the crime charged"). However, in determining whether Moussaoui has made a plausible showing, we must bear in mind that Moussaoui *does* have access to the * * * * summaries. *See* Part V.B, *infra*.

Before considering whether Moussaoui has made the necessary showing with respect to each witness, we pause to consider some general arguments raised by the Government concerning materiality. First, the Government maintains that Moussaoui can demonstrate materiality only by relying on admissible evidence. We agree with the Government to a certain extent—Moussaoui should not be allowed to rely on obviously inadmissible statements (*e.g.*, statements resting on a witness' belief rather than his personal knowledge). *Cf. Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (per curiam) (holding that inadmissible materials that are not likely to lead to the discovery of admissible exculpatory evidence are not subject to disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963)). However, because many rulings on admissibility—particularly those relating to relevance—can only be decided in the context of a trial, most of the witnesses' statements cannot meaningfully be assessed for admissibility at this time. Moreover, statements that may not be admissible at the guilt phase may be admissible during the penalty phase, with its more relaxed evidentiary standards. *See* 18 U.S.C.A. § 3593(c) (West Supp. 2003).

Second, the Government maintains that Moussaoui cannot establish materiality unless he can prove that the witnesses would not invoke their Fifth Amendment rights against self-incrimination. We have previously indicated, however, that a court should not assume that a potential witness will invoke the Fifth Amendment. *Cf. United States v. Walton*, 602 F.2d 1176, 1180 (4th Cir. 1979) (noting that, when a potential defense witness is in protective custody, "[t]he better procedure is to allow the defense counsel to hear directly from the witness whether he would be willing to talk to the defense attorney"). While circumstances indicating that a potential witness will refuse to testify may support a decision not to compel disclosures sought by the defense, *see United States v. Polowichak*, 783 F.2d 410, 414 (4th Cir.

1986), such circumstances are not present here. While it is possible that the witnesses would be reluctant to testify in a deposition setting, there is no particular reason to assume that they would refuse. *Cf. Watkins v. Callahan*, 724 F.2d 1038, 1044 (1st Cir. 1984) (noting that a potential defense witness who was charged with the same murder as the defendant, and who was resisting extradition, "in all likelihood would refuse to testify").

Additionally, the Government argues that even if the witnesses' testimony would tend to exonerate Moussaoui of involvement in the September 11 attacks, such testimony would not be material because the conspiracies with which Moussaoui is charged are broader than September 11. Thus, the Government argues, Moussaoui can be convicted even if he lacked any prior knowledge of September 11. This argument ignores the principle that the scope of an alleged conspiracy is a jury question, *see United States v. Sharpe*, 133 F.34 952, 867 (5th Cir. 1999), and the possibility that Moussaoui may assert that the conspiracy culminating in the September 11 attacks was distinct from any conspiracy in which he was involved. Moreover, even if the jury accepts the Government's claims regarding the scope of the charged conspiracy, testimony regarding Moussaoui's non-involvement in September 11 is critical to the penalty phase. If Moussaoui had no involvement in or knowledge of September 11, it is entirely possible that he would not be found eligible for the death penalty.[13]

---

[13]For example, the Government maintains that even if Moussaoui was not part of the September 11 attacks, he may be subject to the death penalty for withholding information regarding the upcoming attacks after his arrest. *See* 18 U.S.C.A. § 3591(a)(2)(C) (West 2000) (providing that a defendant is eligible for the death penalty if the jury finds, beyond a reasonable doubt, that the defendant "intentionally participated in an act, contemplating that the life of a person would be taken . . . , and the victim died as a direct result of the act"); Br. for the United States at 89 (asserting that Moussaoui "lied in a way that concealed the conspiracy and prevented discovery of the September 11 attacks"). A finding by the jury that Moussaoui lacked any knowledge of the planned September 11 attacks would substantially undermine this theory, although the Government might still be able to establish Moussaoui's eligibility for the death penalty based on his failure to disclose whatever knowledge he did have.

We now consider the rulings of the district court regarding the ability of each witness to provide material testimony in Moussaoui's favor.

* * * * * *

The district court did not err in concluding that Witness * * * * could offer material evidence on Moussaoui's behalf.[14] * * * * Several statements by Witness * * * * tend to exculpate Moussaoui. For example, the * * * * summaries state that * * * * This statement tends to undermine the theory (which the Government may or may not intend to advance at trial) that Moussaoui was to pilot a fifth plane into the White House. Witness * * * * has also * * * * This statement is significant in light of other evidence * * * * indicating that Moussaoui had no contact with any of the hijackers. * * * * This is consistent with Moussaoui's claim that he was to be part of a post-September 11 operation.

The Government argues that Witness * * * * statements are actually incriminatory of Moussaoui.[15] It is true that Witness * * * * has made some statements that arguably implicate Moussaoui in the September 11 attacks. * * * * the government argues that this * * * * indicates that Moussaoui was a member of that group. On balance, however, Moussaoui has made a sufficient showing that evidence from Witness * * * * would be more helpful than hurtful, or at least that we cannot have confidence in the outcome of the trial without Witness * * * * evidence.

---

[14]The parties dispute whether the materiality determinations by the district court are reviewed de novo or for abuse of discretion. We do not decide this question because we would affirm the district court under either standard.

[15]The Government points to several statements relating Witness * * * * belief that Moussaoui was involved in the September 11 attacks. However, a witness' "belief" is not admissible evidence. *See United States v. Tanner*, 941 F.2d 574, 585 (7th Cir. 1991) (noting that witnesses cannot testify to events of which they do not have personal knowledge).

\* \* \* \* \* \*

There can be no question that Witness \* \* \* \* could provide material evidence on behalf of Moussaoui.

\* \* \* \* \* \*

\* \* \* \* a fact that is clearly of exculpatory value as to both guilt and penalty. Additionally, Witness \* \* \* \* provides evidence of Moussaoui's relative lack of importance in the conspiracy.

\* \* \* \* \* \*

The district court determined that Witness \* \* \* \* could provide material evidence because he could support Moussaoui's contention that he was not involved in the September 11 attacks. We agree with the district court that a jury might reasonably infer, from Witness \* \* \* \* that Moussaoui was not involved in September 11. We therefore conclude that Moussaoui has made a plausible showing that Witness \* \* \* \* would, if available, be a favorable witness.

### 3. *Balancing*

Having considered the burden alleged by the Government and the right claimed by Moussaoui, we now turn to the question of whether the district court should have refrained from acting in light of the national security interests asserted by the Government. The question is not unique; the Supreme Court has addressed similar matters on numerous occasions. In all cases of this type—cases falling into "what might loosely be called the area of constitutionally guaranteed access to evidence," *Arizona v. Youngblood*, 488 U.3. 51, 55 (1988) (internal quotation marks omitted)—the Supreme Court has held that the defendant's right to a trial that comports with the Fifth and Sixth Amendments prevails over the governmental privilege. Ultimately, as these cases make clear, the appropriate procedure is for the district court to order production of the evidence or witness and leave to the Government the choice of whether to comply with that order. If the

government refuses to produce the information at issue—as it may properly do—the result is ordinarily dismissal.[16]

For example, in *Roviaro*, the Supreme Court considered the conflict between the governmental interest in protecting the identity of a confidential informant and a defendant's right to present his case. The Court acknowledged the importance of the so-called informer's privilege but held that this privilege is limited by "the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro*, 353 U.S. at 60-61. The Court emphasized that the choice to comply with an order to disclose the identity of a confidential informant belongs to the Government. *See id.* at 59 ("What is usually referred to as the informer's privilege is in reality the *Government's* privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." (emphasis added)); *id.* at 61 (stating that when the identity of a confidential informant is necessary to the defense, "the trial court may require disclosure and, *if the Government withholds the information*, dismiss the action" (emphasis added)).

That it is the responsibility of the Government to decide whether it will comply with a discovery order is even more apparent from *Jencks v. United States*, 353 U.S. 657 (1957), in which the Court held that the government's privilege in confidential reports generated by prosecution witnesses must give way to the defendant's right to effectively cross-examine the witnesses, *see id.* at 668-69. The Court acknowledged that "the protection of vital national interests may militate against public disclosure of documents in the Government's possession" but concluded that

---

[16]Some of the cases in this "area" involve a defendant's Sixth Amendment rights, while others concern a defendant's rights under the Due Process Clause. The fact that different constitutional provisions are involved is immaterial to our analysis. *See*, *e.g.*, *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987) (adopting due process framework for analyzing compulsory process claim).

the Government can invoke its evidentiary privileges only at the price of letting the defendant go free. . . . [S]ince the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

*Id.* at 670-71 (internal quotation marks omitted). The Supreme Court emphatically stated that "[t]he burden is the Government's, *not to be shifted to the trial judge*, to decide whether the public prejudice of allowing the crime to go unpunished is greater than that attendant upon the possible disclosure of state secrets and other confidential information in the Government's possession." *Id.* at 672 (emphasis added).

The Supreme Court has also applied this rule—that a governmental refusal to produce evidence material to the defense is made upon pain of sanction—to the good faith deportation of potential defense witnesses. In *Valenzuela-Bernal*, the defendant claimed that the Government violated his compulsory process rights by deporting two illegal immigrants who were potential defense witnesses. In assessing this claim, the Court observed that the case involved a conflict between the "vitally important" Executive duty of prosecuting criminal offenders and the congressional mandate (to be carried out by the Executive) of promptly deporting illegal aliens. *Valenzuela-Bernal*, 438 U.S. at 863-64. The Court admonished that:

[i]t simply will not do . . . to minimize the Government's dilemma in cases like this . . . . Congress' immigration policy and the practical considerations discussed above [regarding overcrowding in detention facilities] demonstrate that the Government had good reason to deport [the potential witnesses] once it concluded that they possessed no evidence relevant to the prosecution or the defense of [the] criminal charge. No onus, in the sense of "hiding out" or "concealing" witnesses, attached to the Government by reason of its discharge of the obligations imposed upon it by Congress; its exercise of these manifold responsibilities is not to be judged by standards which might be appropriate if

the Government's only responsibility were to prosecute criminal offenses.

*Id.* at 865-66. The Court nevertheless held that the Government's good faith deportation of the potential witnesses would be sanctionable if the witnesses were material to the defense. *See id.* at 873-74.

In addition to the pronouncements of the Supreme Court in this area, we are also mindful of Congress' judgment, expressed in CIPA, that the Executive's interest in protecting classified information does not overcome a defendant's right to present his case. Under CIPA, once the district court determines that an item of classified information is relevant and material, that item must be admitted unless the government provides an adequate substitution. *See* 18 U.S.C.A. App. 3 § 6(c)(1); *Fernandez*, 913 F.2d at 154. If no adequate substitution can be found, the government must decide whether it will prohibit the disclosure of the classified information; if it does so, the district court must impose a sanction, which is presumptively dismissal of the indictment. *See* 18 U.S.C.A. App. 3 § 6(e).

In view of these authorities, it is clear that when an evidentiary privilege—even one that involves national security—is asserted by the Government in the context of its prosecution of a criminal offense, the "balancing" we must conduct is primarily, if not solely, an examination of whether the district court correctly determined that the information the Government seeks to withhold is material to the defense. We have determined that the enemy combatant witnesses can offer material testimony that is essential to Moussaoui's defense, and we therefore affirm the January 30 and August 29 orders. Thus, the choice is the Government's whether to comply with those orders or suffer a sanction.

V.

As noted previously, the Government has stated that it will not produce the enemy combatant witnesses for depositions (or, we presume, for any other purpose related to this litigation). We are thus left in the following situation: the district court has the power to order production of the enemy combatant witnesses and has properly determined that they could offer material testimony on Moussaoui's behalf, but

the Government has refused to produce the witnesses. Under such circumstances, dismissal of the indictment is the usual course. *See, e.g., Jencks*, 353 U.S. at 672; *Roviaro*, 353 U.S. at 61. Like the district court, however, we believe that a more measured approach is required.[17] Additionally, we emphasize that no punitive sanction is warranted here because the Government has rightfully exercised its prerogative to protect national security interests by refusing to produce the witnesses.[18]

Although, as explained above, this is not a CIPA case, that act nevertheless provides useful guidance in determining the nature of the remedies that may be available. Under CIPA, dismissal of an indictment is authorized only if the government has failed to produce an adequate substitute for the classified information, *see* 18 U.S.C.A. App. 3 § 6(c)(1), and the interests of justice would not be served by imposition of a lesser sanction, *see id.* § 6(e)(2). CIPA thus enjoins district courts to seek a solution that neither disadvantages the defendant nor penalizes the government (and the public) for protecting classified information that may be vital to national security.

---

[17]The Government asserts that we need not provide any remedy for the denial of access to the witnesses because Moussaoui may have a due process right to the admission of hearsay evidence containing statements made by the witnesses. *See Chambers*, 410 U.S. at 302-03. The possible existence of such a right—which the Government indicated at oral argument that it would contest—does not excuse us from remedying the violation of Moussaoui's Sixth Amendment rights.

Furthermore, despite my colleague's assertion to the contrary, *see* post, at 53, this question is not ripe for review. *Chambers* is concerned with the admission of hearsay evidence at trial; however, Moussaoui has not sought the admission of the witnesses' hearsay statements, nor has the Government sought to exclude those statements. Application of *Chambers* is therefore premature.

[18]We emphasize that by all appearances, the Government's refusal to produce the witnesses is done in the utmost good faith. The Government is charged not only with the task of bringing wrongdoers to justice, but also with the grave responsibility of protecting the lives of the citizenry. The choice the government has made is not without consequences, but those consequences are not punitive in nature.

A similar approach is appropriate here. Under such an approach, the first question is whether there is any appropriate substitution for the witnesses' testimony. Because we conclude, for the reasons set forth below, that appropriate substitutions are available, we need not consider any other remedy.

## A.  *Standard*

CIPA provides that the government may avoid the disclosure of classified information by proposing a substitute for the information, which the district court must accept if it "will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." *Id.* § 6(c)(l); *see United States v. Rezaq*, 134 F.3d 1121, 1143 (D.C. Cir. 1998) (concluding that proposed substitutions for classified documents were acceptable because "[n]o information was omitted from the substitutions that might have been helpful to [the] defense, and the discoverable documents had no unclassified features that might have been disclosed to [the defendant]") We believe that the standard set forth in CIPA adequately conveys the fundamental purpose of a substitution: to place the defendant, as nearly as possible, in the position he would be in if the classified information (here, the depositions of the witnesses) were available to him. *See* H. R. Conf. Rep. No. 95-1436, at 12-13 (1980), *reprinted in* 1980 U.5.C.C.A.N. 4307, 4310-11 (explaining that "precise, concrete equivalence is not intended. The fact that insignificant tactical advantages could accrue to the defendant by use of the specific classified information should not preclude the court from ordering alternative disclosure."); *cf. Fernandez*, 913 F.2d at 158 (affirming rejection of proposed substitutions that "fell far short of informing the jury about that which the trial judge had already determined to be essential to [the] defense"). Thus, a substitution is an appropriate remedy when it will not materially disadvantage the defendant. *Cf. Bell v. Woods*, 402 F. Supp. 803, 810 (N.D. Ala. 1975) ("Access—or due process—is ultimately a matter of providing an opportunity to have one's claim resolved in a meaningful manner, and does not guarantee that such claim will be presented in the most effective manner.").

## B.  *Substitutions proposed by the Government*

The Government proposed substitutions for the witnesses' deposition testimony in the form of a series of statements derived from the * * * * summaries.[19] The district court rejected all proposed substitutions as inadequate.[20] The ruling of the district court was based on its conclusions regarding the inherent inadequacy of the substitutions and its findings regarding the specific failings of the Government's proposals. For the reasons set forth below, we reject the ruling of the district court that any substitution for the witnesses' testimony would be inadequate. We agree, however, with the assessment that the particular proposals submitted by the Government are inadequate in their current form.

First, the district court deemed the substitutions inherently inadequate because the * * * * reports, from which the substitutions were ultimately derived, were unreliable.[21] This was so, the court reasoned, * * * * The district court also complained that it cannot be determined whether the * * * * reports accurately reflect the witnesses' statements * * * *[22]

---

[19]* * * *.

[20]The court filed a memorandum opinion discussing in detail its reasons for rejecting the proposed substitutions for Witness * * * * deposition testimony. The rejection of the Government's proposed substitutions for the deposition testimony of Witnesses * * * * was accomplished by a brief order finding the substitutions inadequate for the reasons stated in its order concerning the proposed substitutions for Witness * * * * deposition testimony.

[21]The court also deemed the substitutions inadequate because the use of substitutions would deprive Moussaoui of the ability to question the witnesses regarding matters that do not appear in the * * * * reports. In essence, the district court appears to have concluded that the substitutions are inadequate because they are not the same thing as a deposition. However, we have already determined that a proposed substitution need not provide Moussaoui with all the benefits of a deposition in order to be adequate.

[22]The district court did not complain that the * * * * summaries do not accurately summarize * * * * reports. At the hearing concerning the Government's proposed substitutions for Witness * * * * testimony, the court commented that it had been "impressed with the accuracy" of the summaries. Supp. J.A.C. (03-4162) 175.

The conclusion of the district court that the proposed substitutions are inherently inadequate is tantamount to a declaration that there could be no adequate substitution for the witnesses' deposition testimony. We reject this conclusion. The answer to the concerns of the district court regarding the accuracy of the * * * * reports is that those * * * * These considerations provide sufficient indicia of reliability to alleviate the concerns of the district court.

Next, the district court noted that the substitutions do not indicate that they are summaries of statements * * * * over the course of several months. We agree with the district court that in order to adequately protect Moussaoui's right to a fair trial, the jury must be made aware of certain information concerning the substitutions. The particular content of any instruction to the jury regarding the substitutions lies within the discretion of the district court. However, at the very least the jury should be informed that the substitutions are derived from reports * * * * and that no one involved in the litigation has been privy to the * * * * process or has had any input * * * * . The jury should also be instructed that the statements were obtained under circumstances that support a conclusion that the statements are reliable.

We reject the suggestion of the district court that the Government acted improperly in attempting to organize the information presented in the substitutions. Counsel rarely, if ever, present information to the jury in the order they received it during pretrial investigations. Indeed, organizing and distilling voluminous information for comprehensible presentation to a jury is a hallmark of effective advocacy. In short, while there may be problems with the *manner* in which the Government organized the substitutions, the fact that the Government has attempted such organization is not a mark against it.

The district court identified particular problems with the proposed substitutions for Witness * * * * testimony. For example, the court noted that the proposed substitutions failed to include exculpatory information * * * * and incorporated at least one incriminatory inference not * * * *[23] Our own review of the proposed substitutions for

---

[23]One of the * * * * summaries contains the statement, * * * * As the district court noted, this statement does not appear in the Government's proposed substitutions.

the testimony of Witnesses * * * * reveals similar problems.[24] These problems, however, may be remedied as described below.

## C.  *Instructions*

For the reasons set forth above, we conclude that the district court erred in ruling that any substitution for the witnesses' testimony is inherently inadequate to the extent it is derived from the * * * * reports. To the contrary, we hold that the * * * * summaries (which, as the district court determined, accurately recapitulate the * * * * reports) provide an adequate basis for the creation of written statements that may be submitted to the jury in lieu of the witnesses' deposition testimony.

The crafting of substitutions is a task best suited to the district court, given its greater familiarity with the facts of the case and its authority to manage the presentation of evidence.[25] Nevertheless, we think it is appropriate to provide some guidance to the court and the parties.

---

* * * * As the district court noted, the phrase * * * * does not appear in any of the * * * * summaries.

We have also reviewed then-standby counsel's proposed substitutions for Witness * * * * testimony, and find them to be problematic as well. For example, counsel's proposed substitutions include a statement that Witness * * * * Such a statement appears nowhere in the * * * *

[24]For example, paragraph 1 of the Government's proposed substitutions * * * * This statement is misleading because it omits the exculpatory content of the summary from which the statement is derived. * * * *

The proposed substitutions for Witness * * * * deposition testimony omit the details * * * * Moussaoui asserts that these details are important because they serve to highlight the contrast between * * * * thus bolstering Moussaoui's claim that he was not involved in the September 11 attacks.

[25]While the phrase "the crafting of substitutions" may suggest the drafting of original language for submission to the jury, nothing of the sort is intended, as is made clear in the following paragraph in the text.

First, the circumstances of this case—most notably, the fact that the substitutions may very well support Moussaoui's defense—dictate that the crafting of substitutions be an interactive process among the parties and the district court.[26] Second, we think that accuracy and fairness are best achieved by crafting substitutions that use the exact language of the * * * * summaries to the greatest extent possible. We believe that the best means of achieving both of these objectives is for defense counsel to identify particular portions of the * * * * summaries that Moussaoui may want to admit into evidence at trial. The Government may then argue that additional portions must be included in the interest of completeness. *See* Fed. R. Evid. 106; *United States v. Gravely*, 840 F.2d 1156, 1163-64 (4th Cir. 1998) (stating "the obvious notion that parties should not be able to lift selected portions [of a recorded statement] out of context"). What the Government may not

---

[26]We disagree with Judge Gregory's view that, by assigning the district court a role in the crafting of substitutions, we have "place[d] the district court in the position of being an advocate in the proceedings," post, at 59, and that "we are setting ourselves out as super-arbiters of the admission of evidence in this case," *id.* at 60 n.5. In fact, what we are asking the district court to do is little removed from the quite ordinary judicial task of assessing the admissibility of evidence. And, any subsequent review by this court on these matters will involve nothing more than review of evidentiary rulings—a routine function of an appellate court.

We also reject the notion that we are improperly "asking the [district] court to do something that it has stated cannot be done." *Id.* at 59. The district court ruled that the * * * * reports were unreliable; we have reached a contrary conclusion. There is no reason to suppose that the district court is incapable of proceeding on the premise that the * * * * reports are reliable. We are also confident that it lies well within the competence of the district court to forestall any attempt, by either party, to "offer a distorted version of the witnesses' statements." *Id.* at 60.

Finally, we are not "transferring to the court the authority that CIPA vests in the Government," *id.* at 59, by mandating that the district court be involved in crafting substitutions. CIPA authorizes the Government to move for an order approving substitutions for classified information, *see* 18 U.S.C.A. App. 3 § 6(c)(1), but it does not mandate that the Government draft proposed substitutions. While we imagine that substitutions will be drafted by the Government in the vast majority of cases, nothing in CIPA expressly or implicitly precludes the involvement of defense counsel or the district court.

do is attempt to use the substitutions to bolster its own case by offering what it considers to be inculpatory statements. *Cf. Crawford v. Washington*, 124 S. Ct. 1354, 1374 (2004) (holding that testimonial hearsay is admissible against a defendant only if the declarant is unavailable and the defendant had an opportunity to cross-examine when the hearsay statement was made). If the substitutions are to be admitted at all (we leave open the possibility that Moussaoui may decide not to use the substitutions in his defense), they may be admitted only by Moussaoui. Based on defense counsel's submissions and the Government's objections, the district court could then create an appropriate set of substitutions. We leave to the discretion of the district court the question of whether to rule on the admissibility of a particular substitution (*e.g.*, whether a substitution is relevant) at trial or during pre-trial proceedings.

As previously indicated, the jury must be provided with certain information regarding the substitutions. While we leave the particulars of the instructions to the district court, the jury must be informed, at a minimum, that the substitutions are what the witnesses would say if called to testify; that the substitutions are derived from statements obtained under conditions that provide circumstantial guarantees of reliability: that the substitutions contain statements obtained * * * * ; and that neither the parties nor the district court has ever had access to the witnesses.[27]

## VI.

In summary, the judgment of the court is as follows. The January 30 and August 29 orders are affirmed, as is the rejection of the Government's proposed substitutions by the district court. The order imposing sanctions on the Government is vacated, and the case is

---

[27]We are mindful of the fact that no written substitution will enable the jury to consider the witnesses' demeanor in determining their credibility. *See Fieldcrest Cannon, Inc. v. NLRB*, 97 F.3d 65, 71 (4th Cir. 1996) (noting that demeanor is a factor in determining credibility). We believe that the instructions outlined above, plus any other instructions the district court may deem necessary in the exercise of its discretion, adequately address this problem.

remanded for the crafting of substitutions for the deposition testimony of the enemy combatant witnesses.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*

**Volume 2 of 2**

WILLIAMS, Circuit Judge, concurring in part and dissenting in part:

While I appreciate my colleagues' effort to resolve the difficult issues that this case presents, I cannot agree with their separation of powers analysis. My colleagues conclude that Moussaoui has a Sixth Amendment right to compulsory process of these witnesses based solely on the district court's ability to serve process on the witnesses' custodian. This approach accords little, if any, weight to the formidable separation of powers concerns that the Government raises, specifically the Executive's need to accomplish the war-making, national security, and foreign relations duties delegated to it by the Constitution. I believe that the separation of powers analysis impacts whether the district court had the authority to issue its orders granting access to the witnesses. If separation of powers principles prohibit the district court from granting compulsory process, as I believe they do, Moussaoui has no Sixth Amendment right to the witnesses' testimony.

At the end of the day, the practical difference between the result I reach and that of my colleagues is nil. As discussed below, I believe Moussaoui has a constitutional right to the information provided by the witnesses, and I believe that the substitutions in their current form do not adequately protect that right. I feel compelled to write separately, however, because my colleagues' approach impermissibly jeopardizes the security of our Nation and its allies by intruding on the Executive's ability to perform its war-making, military, and foreign relations duties. Holding that defendants have a right to compulsory process of any alien held abroad in United States custody and control disrupts the proper balance between the coordinate branches. If access is granted, it is undisputed that the Executive's interest is irreparably lost, with the attendant consequences to the multinational efforts to combat terrorism on a global scale. Accordingly, I believe the separation of powers question, in other words, the question of the scope of the district court's authority, must be decided before assuming that the defendant's right to compulsory process automatically extends to these witnesses.

For the reasons discussed below, I conclude, based on separation of powers principles, that the district court lacked the authority to order the custodian[1] to produce these alien enemy combatants who are being detained * * * * on foreign soil, and thus, I dissent from the affirmance of the district court on this issue.

Although I do not believe that Moussaoui has a right to compulsory process of these witnesses under the Sixth Amendment, I would conclude that he does have a right grounded in the Fifth Amendment to introduce material, favorable *information* from these people that is already in the Government's possession. Thus, the district court's materiality analysis remains relevant. I concur in Part IV.C.2.a through Part IV.C.2.c of my colleagues' opinion, which concludes that Moussaoui has made a sufficient showing that the information provided by the witnesses is material and favorable. I then come, as do my colleagues, to the question of substitutions. Although I would require substitutions for the * * * * summaries instead of for hypothetical deposition testimony, this difference does little to change the substitution inquiry, given the circumstances of this case. Accordingly, I concur in Part V.A through Part V.C of Chief Judge Wilkins's opinion to the extent that the analysis is not inconsistent with providing substitutions for the * * * * summaries.

I also concur in Part I of my colleagues' opinion, which includes the background information relevant to this appeal, and Part II, which describes our jurisdiction.

## I.

Turning to the question of the district court's authority, we review de novo the legal question of whether the district court had the authority to order the custodian to produce an alien enemy combatant who was captured * * * * outside the territorial jurisdiction of the United States.

---

[1]As my colleagues discuss, *ante* at 11, we assume for purposes of this appeal that the witnesses are in United States custody. It is not clear whether we are to assume that the witnesses are in the custody of the military * * * * . *See ante* at 12-13 & n.9. Accordingly, I simply use the term "custodian" to refer to the military * * * * .

I agree with my colleagues that the district court's process can reach the witnesses' custodian, whom we assume is a U.S. citizen, whether that person is within the United States or abroad. *Cf. ante* at 12 ("There can be no question that the district court possesses the power to serve process on the witnesses' custodian."). I do not believe, however, that this fact resolves the entire case.[2] I believe that separation of powers principles place the enemy combatant witnesses beyond the reach of the district court. Accordingly, Moussaoui does not have a Sixth Amendment right to their compulsion. *Cf. ante* at 13 n.10 (If "separation of powers principles place the enemy combatant witnessed beyond the reach of the district court . . . , then Moussaoui would not have an enforceable Sixth Amendment right to the witnesses' testimony.")

My colleagues come to the opposite conclusion by finding that

---

[2] I acknowledge that the Supreme Court has noted that the writ of habeas corpus "is directed to, and served upon, not the person confined, but his jailer." *See ante* at 11 (quoting *Ex Parte Endo*, 323 U.S. 283, 306 (1944)); *see also Braden v. 30th Jud. Cir. Ct.*, 410 U.S. 484, 494-95 (1973). The cases in which the Supreme Court so noted, however, involved American citizens, not aliens detained abroad. For example, in *Braden*, the question presented was the "choice of forum where a prisoner attacks an interstate detainer on federal habeas corpus." *Braden*, 410 U.S. at 488. In other words, *a* federal court had the authority to grant the writ, it was merely unclear which federal court was the appropriate one. Similarly, in *Endo*, the relevant question was whether the district court lost its jurisdiction over Endo's habeas petition when she was moved to a Relocation Center outside the district court's territorial jurisdiction. The court held that Endo's presence in the jurisdiction at the time she filed her petition gave the district court jurisdiction and that her later removal did not "cause it to lose jurisdiction where a person in whose custody she is remains within the district." *Endo*, 323 U.S. at 306.

Along these same lines, although *Braden* and *Endo* do not distinguish between American citizens and aliens, "courts in peace time have little occasion to inquire whether litigants before them are alien or citizen." *Johnson v. Eisentrager*, 339 U.S. 763, 771 (1950). Accordingly, I do not believe that the fact that writs are directed to the custodian answers the question of whether separation of powers prohibits the district court from granting access to these aliens who are detained beyond the territorial jurisdiction of the United States.

"[t]he witnesses at issue here . . . are within the process power of the district court, and Moussaoui therefore has a Sixth Amendment right to their testimony.[3] *Ante* at 17. Once they conclude that Moussaoui has a Sixth Amendment right to the witnesses' testimony, they treat the Government's separation of powers concerns like the assertion of an evidentiary privilege, which must yield to a finding that the witnesses have information material to the defense. *See ante* at 29 ("[W]hen an evidentiary privilege—even one that involves national security—is asserted by the Government . . . , the 'balancing' we must conduct is primarily, if not solely, an examination of whether the district court correctly determined that the information the Government seeks to withhold is material to the defense."). Were the Government asserting merely an evidentiary privilege, I might agree with this analysis. *But see United States v. Nixon*, 418 U.S. 683, 706, 713 (1974) (suggesting that a claim of privilege based on the "need to protect military, diplomatic, or sensitive national security secrets" might prevail over the need for production of evidence in a criminal proceeding). The evidentiary privilege cases, however, while undoubtedly useful in analyzing this complicated issue of first impression, have one fundamental difference from this case. In those cases, which predominantly involve classified or confidential documents or information, the district court had the authority to issue an order requiring disclosure. *Cf. infra* at 52-55. Where, as here, the Government argues that separation of powers principles deprive the district court of the authority to enter a particular order, I believe that the structure of the analysis is different.[4] *Cf. Nixon v. Administrator of General Serv.*, 433

---

[3]Although my colleagues conclude that the witnesses are within the process power of the court, they base this conclusion solely on the power over the custodian. *See ante* at 11 n.8 ("The district court has never had —and does not now have—the power to serve process on the witnesses.").

[4]I respectfully disagree with Judge Gregory's suggestion that my analysis "places the cart before the horse." *Post* at 56 n.1. I believe that the analogy to CIPA, like the analogy to the evidentiary privilege cases generally, is inapt in analyzing the separation of powers question. In both circumstances, the district court has the authority to issue an order requiring disclosure, generally of classified documents in the government's possession, and the question is whether the government's interest in confidentiality can outweigh the defendant's need for the information. In

U.S. 425, 441-55 (1977) (analyzing separation of powers claim separately from presidential privilege claim). Although this area of the law is far from settled, I believe that the proper inquiry asks first whether separation of powers principles prohibit the district court from granting access to the witnesses before assuming that Moussaoui has a right to compulsory process of the witnesses based solely on their custodian's amenability to service of process.[5]

Turning to the separation of powers question, "in determining whether [an action] disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon v. Admin. of General Serv.*, 433 U.S. at 443. "Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of [the Judiciary]." *Id.* In my view, the district court's orders prevent the Executive from accomplishing its war-making, military, and foreign relations duties.

"Among powers granted to Congress by the Constitution is power to provide for the common defense, to declare war, . . . [and] to make rules concerning captures on land and water, which this Court has construed as an independent substantive power. . . . The first of the

---

contrast, I view the question presented by this case as whether separation of powers principles deprive the district court of the ability to grant the requested access. Thus, my analysis does not speak at all to the constitutionality of CIPA because under the CIPA framework, the district court's authority to act is not in dispute.

Moreover, I believe that CIPA is best understood as protecting a defendant's due process right to "a fair opportunity to defend against the State's accusations," *Chambers v. Mississippi*, 410 U.S. at 284, 294 (1973), and not a defendant's compulsory process rights. My approach, of course, fully protects the defendant's due process rights by allowing admission of the information sought. *See infra* at 52-55.

[5]It seems that under my colleagues' analysis, there is no Executive interest sufficiently important that it could deprive the district court of authority to enter orders granting access to the witnesses.

enumerated powers of the President is that he shall be Commander-in-Chief of the Army and Navy . . . [a]nd, of course, grant of war power includes all that is necessary and proper for carrying these powers into execution." *Johnson v. Eisentrager*, 339 U.S. 763, 788 (1950) (internal citation omitted); *see also Hamdi v. Rumsfeld* (*Hamdi II*), 296 F.3d 278, 281 (4th Cir. 2002). Gathering intelligence related to national security is also entrusted solely to Congress and the Executive. *CIA v. Sims*, 471 U.S. 159, 167 ("As part of its post war reorganization of the national defense system, Congress chartered the Agency with the responsibility of coordinating intelligence activities relating to national security.") As my colleagues have noted:

> It is not an exaggeration to state that the effective performance of these duties is essential to our continued existence as a sovereign nation. Indeed, 'no governmental interest is more compelling than the security of the Nation.' *Haig v. Agee*, 453 U.S. 280, 307 (1981); *see Hamdi II*, 296 F.3d at 283 (observing, in the post-September 11 context, that 'government has no more profound responsibility than the protection of Americans . . . against additional unprovoked attack'). Thus, '[i]n accordance with [the] constitutional text, the Supreme Court has shown great deference to the political branches when called upon to decide cases implicating sensitive matters of foreign policy, national security, or military affairs.' *Hamdi II*, 296 F.3d at 281.

*Ante* at 19.

The Executive's war-making authority is one of "extraordinary breadth." *Hamdi v. Rumsfeld* (*Hamdi III*), 316 F.3d 450, 466 (4th Cir. 2003), *petition for cert. granted*, No. 03-6696 (Jan. 9, 2004). This authority includes the power to capture and detain individuals involved in hostilities against the United States.[6] *See Ex Parte Quirin*,

---

[6]I note that Congress specifically authorized the President to use military force "against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." Pub. L. No. 107-40, 115 Stat. 224. (September 18, 2001).

317 U.S. 1, 25 (1942); *Hamdi II*, 296 F.3d at 281-82. Indeed, the capture, detention, and interrogation of enemy aliens, like the designation of a detainee as an enemy combatant, "bears the closest imaginable connection to the President's constitutional responsibilities during the actual conduct of hostilities." *Hamdi III*, 316 F.3d at 466; *Hamdi II*, 296 F.3d at 281-82 (holding that the judiciary's deference to the political branches in "cases implicating sensitive matters of foreign policy, national security, or military affairs" extends to "detention [of enemy combatants] after capture on the field of battle").

Moreover, the Supreme Court has held that "[e]xecutive power over enemy aliens, undelayed and unhampered by litigation, has been deemed, throughout our history, essential to war-time security." *Eisentrager*, 339 U.S. at 774. The Government's proffer concerning the harm that will result if these witnesses are produced demonstrates the truth of this statement.

I agree with my colleagues that we must accept as true the Government's averment

> that * * * * the enemy combatant witnesses is critical to the ongoing effort to combat terrorism by al Qaeda. . . . Their value as intelligence sources can hardly be overstated. And, we must defer to the Government's assertion that interruption * * * * will have devastating effects on the ability to gather information from them. *Cf. CIA v. Sims*, 471 U.S. 159, 176 (1985) (noting that 'whether an intelligence source will be harmed if his identity is revealed will often require complex political, historical, and psychological judgments' that courts are poorly equipped to make).

*Ante* at 19-20; *cf. United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990) (noting that we do not question "judgments made by the Attorney General concerning the extent to which the information in issue here implicates national security"). * * * *,[7] could result in the loss of information that might prevent future terrorist attacks"—attacks that could claim thousands of American lives. *Ante* at 20.

---

[7]* * * *

Additionally, as was the case in *Eisentrager*, the district court's orders are likely to bolster our enemies and undermine the Executive's war-making efforts. Although some of the concerns with the Great Writ that the *Eisentrager* Court identified[8] are not present with a testimonial writ, many of the concerns are equally present in this context, including: the custodian would have to transport the witness to the location of the deposition; the writ would be equally available during active hostilities as during the times between war and peace (and the writ would be equally available immediately after capture as well as months after capture); moreover, granting a testimonial writ could bring aid and comfort to our enemies; it would diminish the prestige of our commanders with enemies[9] and wavering neutrals;[10] the logistics and security concerns of coordinating production of the detainee to testify will divert the attention of at least some military or intelligence personnel, perhaps even the field commander; and finally, it is highly likely that the result of a court being able to force the custodian * * * * of an alien enemy combatant detained abroad would be a conflict between judicial and military opinion highly comforting to enemies of the United States. In this regard, I note that the Government has articulated more than a generalized interest in unfettered pursuit of the war effort. *Cf. United States v. Nixon*, 418 U.S. at 711. (rejecting the claim of presidential privilege where privilege was based only on the "generalized interest in confidentiality"). Rather,

---

[8]*See ante* at 20-21 (quoting *Eisentrager*, 339 U.S. at 778-79).

[9]For example, a captured enemy and his home country or terrorist group will know that despite what military * * * * say, their control over detainees is not absolute. Also, terrorists captured and tried in the United States will know that by requesting access to an alien who is detained outside the country, the United States will be forced to choose between interrupting * * * * , or severely limiting the prosecution of the U.S. defendant.

[10]For example, a wavering neutral country might be unwilling to aid the U.S., in capturing a terrorist because if he is captured by the U.S. then he will be subject to being produced at a trial of a U.S. defendant, which would undermine * * * * the captured enemy combatant. Because the captured enemy combatant might have information relevant to planned attacks in the neutral country that could not be obtained * * * * , wavering neutrals would not want to do anything that would undermine the ability to extract information from the enemy combatant.

the Government has offered a case-specific analysis of the harm that will be done by interruption * * * * .

Finally, as my colleagues note, *ante* at 20, we must also be mindful of the effect that production of the witnesses would have on the Executive's ability to conduct foreign relations.

I therefore conclude that requiring the Government to produce for depositions alien enemy combatants detained abroad * * * * , the goal of which is to protect the security of American lives from future terrorist attacks,[11] would prevent the Executive from exercising its war and foreign relations powers. I also conclude that the grave risks to national security that would arise from granting access to the witnesses cannot be justified by the need to promote objectives within the constitutional authority of the Judiciary. *See Nixon v. Admin. of Gen. Serv.*, 433 U.S. at 443.

I agree that the right of a defendant to offer testimony of witnesses in his favor and to compel their attendance "if necessary" is fundamental to our adversarial system. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). We have recognized, however, that "the right to compulsory process is not absolute." *Smith v. Cromer*, 159 F.3d 875, 882 (4th Cir. 1998) (noting that the Sixth Amendment right to compulsory process is subject to balancing under *Roviaro v. United States*, 353 U.S. 53 (1957)); *cf. Buie v. Sullivan*, 923 F.2d 10, 11 (2d Cir. 1990) (Sixth Amendment right to present a defense was not violated by arrest of a witness who had exculpatory information, even though arrest caused the witness to invoke the Fifth Amendment).

The "immunity cases" provide a helpful, albeit imperfect, analogy here. In these cases, the majority of courts have held that, in the absence of prosecutorial misconduct, no constitutional violation inures from the court's inability to immunize a witness even if the material, favorable information possessed by the witness could not be obtained in any other way. These cases illustrate that when separation

---

[11] * * * *

of powers concerns bar the court from acting, the defendant's right to a fair trial is not infringed.[12]

In *Autry v. Estelle*, 706 F.2d 1394 (5th Cir. 1983), the Fifth Circuit held that "district courts may not grant immunity to defense witnesses simply because that witness has essential exculpatory information unavailable from other sources." 706 F.2d at 1401 (quoting *United States v. Thevis*, 665 F.2d 616, 639 (5th Cir. 1982)). The court "followed the Second Circuit's decision in *Turkish* in finding the role of dispensing immunity not to be 'a task congenial to the judicial function.'" *Id.* (quoting *United States v. Turkish*, 623 F.2d 769, 776 (2d Cir. 1980)); *see also Turkish*, 623 F.2d at 776 (holding that defendants do not have a right to defense witness immunity and that "confronting the prosecutor with a choice between terminating prosecution of the defendant or jeopardizing prosecution of the witness is not a task congenial to the judicial function"). The "refusal to entertain . . . claims [for defense witness immunity] in federal prosecution is . . . bottomed on separation of power concerns and our opinion that federal judges lack such power in federal prosecutions." *Autry*, 706 F.2d at 1402. The Fifth Circuit reaffirmed this conclusion in a capital case, holding that "absent prosecutorial misconduct, separation of powers concerns and the possibility of abuse preclude federal district courts from granting immunity to a defense witness merely because that witness has essential exculpatory information unavailable from other sources." *Matheson v. King*, 751 F.2d 1432, 1443 (5th Cir. 1985). Other circuits have come to similar conclusions. *See, e.g., United States v. Mackey*, 117 F.3d 24, 27-28 (1st Cir. 1997) (holding that only prosecutorial misconduct justifies a court's refusal to allow the prosecution to proceed unless it grants immunity); *id.* at 28 (rejecting the argument that "a strong need for exculpatory testimony can over-

---

[12]From the context of the immunity cases, I note that even if access to these witnesses were granted, the witnesses may well invoke the privilege against self-incrimination. *See ante* at 24 (noting that "it is possible that [the witnesses] would be reluctant to testify in a deposition setting"). If that occurred, the absence of prosecutorial misconduct in this case would mean that the Government could not be compelled to grant immunity to the witnesses. In such a circumstance, the national security of our country would have been jeopardized by the grant of access, and Moussaoui would have gained nothing.

ride even legitimate, good faith objections by the prosecutor to a grant of immunity"); *United States v. Frans*, 697 F.2d 188, 191 (7th Cir. 1983) (holding that defendant had not made a showing of "bad motives of the government" and that "a defendant must make a substantial evidentiary showing that the government intended to distort the judicial fact-finding process" before the court will review a denial of immunity); *United States v. Talley*, 164 F.3d 989, 997 (6th Cir. 1999) (noting that "compelled judicial use immunity would raise separation of powers concerns"); *see also United States v. Bowling*, 239 F.3d 973, 976 (8th Cir. 2001) (holding that the district court has no authority to compel use immunity); *cf. Talley*, 164 F.3d at 998 (noting that compelled immunity may be necessary where the government's selective use of immunity results in evidence that is "egregiously lopsided," or where there is prosecutorial misconduct).

Consistent with this majority approach, "[w]e have held that the district court is without the authority to confer immunity *sua sponte*." *United States v. Abbas*, 74 F.3d 506, 511 (4th Cir. 1996). A district court can compel the prosecution to grant immunity only when "(1) the defendant makes a decisive showing of prosecutorial misconduct or overreaching *and* (2) the proffered evidence would be material, exculpatory and unavailable from all other sources." *Id.* at 512 (emphasis in original). In other words, a showing that the testimony sought would be material and favorable to the defense is not enough to override the separation of powers concerns inherent in compelling a grant of immunity.

I disagree with my colleagues' conclusion that these immunity cases stand for the proposition that "legitimate separation of powers concerns [cannot] effectively insulate the Government from being compelled to produce evidence or witnesses." *See ante* at 16. I interpret the immunity cases as standing for the proposition that the Executive, acting through the prosecution, forfeits its right to rely on the separation of powers as a bar to compelled judicial immunity when it exceeds the bounds of its authority by overreaching or some other type of prosecutorial misconduct.[13] In these circumstances, compelled

---

[13]My colleagues distinguish the immunity cases by noting that a defendant has no Sixth Amendment right to the testimony of witnesses who

judicial immunity is akin to a punishment of the Executive for failing to perform properly the duties assigned to it by the Constitution. This conclusion is bolstered by the cases, such as *Abbas* and *Mattheson*, that hold unequivocally that a showing that the evidence sought is material, favorable and unavailable from any other source is insufficient to require a grant of immunity. Thus, absent bad faith by the government, legitimate separation of powers concerns *can* restrict the court's authority to compel the government to make the testimony of certain witnesses available. I note that Moussaoui has conceded that there has been no prosecutorial misconduct, overreaching, or other abuse in this case.[14] (*See* Appellee's Br. (03-4792) at 3 ("We do not intend to question the integrity of any Government official working on this case."); *see also ante* at 13 n.10 (noting that the Government is not attempting to invoke national security concerns as a means of depriving Moussaoui of a fair trial).)

Returning to the issue presented by this case, the district court's orders required the custodian to interrupt * * * * aliens detained overseas, the practical effect of which would be to eliminate the ability of the custodian to * * * * any further information that could help save the lives of American citizens or our allies. Given the Supreme Court and this court's unequivocal statements regarding the primacy of Executive authority over both aliens and intelligence gathering during wartime, and the serious national security risks that would result from granting access, I conclude that separation of powers principles pro-

invoke their privilege against self-incrimination, whereas Moussaoui has a Sixth Amendment right to the testimony of these witnesses. *Ante* at 17. I believe that this distinction assumes away the very question before us, that is, whether Moussaoui has a Sixth Amendment right to the testimony of these witnesses or whether legitimate separation of powers principles prohibit the district court from granting compulsory process to these witnesses.

[14]In *United States v. Abbas*, 74 F.3d 506, 512 (4th Cir. 1996), we held that there was no prosecutorial misconduct in refusing to grant immunity to a co-defendant because the co-defendant was "the subject of impending prosecution." If pursuing a legitimate prosecution does not constitute misconduct, then pursuing a legitimate * * * * information that might save thousands of lives certainly does not amount to misconduct.

hibited the district court from issuing its January 30 and August 29 orders granting access to the witnesses. Where the court lacks the authority to compel production or testimony of a witness, the defendant is not entitled to any remedy for that lack of authority.[15] *Cf. United States v. Zabaneh*, 837 F.2d 1249, 1259-60 (5th Cir. 1988) ("It is well established that convictions are not unconstitutional under the Sixth Amendment even though the United States courts lack power to subpoena witnesses, (other than American citizens) from foreign countries."); *United States v. Greco*, 298 F.2d 247, 251 (2d Cir. 1962) (holding that there was no constitutional violation even though the court could not compel production of Canadian witnesses living in Canada); *United States v. Sensi*, 879 F.2d 888, 898 (D.C. Cir. 1989) (holding that there was no constitutional violation even though the court could not compel production of Kuwaiti witnesses); *Autry*, 706 F.2d at 1401-03 (holding that there was no constitutional violation where the court lacked the power to grant judicial immunity); *Abbas*, 74 F.3d at 512 (same).

## II.

Even though Moussaoui does not have a right to access to the witnesses,[16] I agree with Moussaoui that in the circumstances of this case the Government may not proceed (and, in fact, has not proceeded) as if it does not have information from these detainees. In compliance with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), the Government has been providing summaries * * * * to the defense.

---

[15]I note that if the balance of the separation of powers concerns subsequently shifts in favor of Moussaoui * * * *, the district court retains the flexibility to respond to changed circumstances, and our judicial system provides numerous opportunities to correct any error, either post-trial or on collateral review. On the other hand, if access is granted erroneously, the detriment to the Executive's interest is permanent—there is no way to undo the harm created by the interruption * * * *.

[16]For the reasons stated above, I do not believe that Moussaoui's Sixth Amendment rights have been violated. If there had been a violation of his Sixth Amendment rights, however, I would agree with my colleagues that the existence of due process rights would "not excuse us from remedying the violation of Moussaoui's Sixth Amendment rights." *Ante* at 30 n.17.

Throughout the long history of this case, Moussaoui has based his requests for access to these detainees on a need to elicit the information contained in these * * * * summaries in an admissible form. Accordingly, I would construe Moussaoui's filings as containing a request for admission of the information itself, and I believe that this question is properly before us.[17] Moreover, I note that the analysis of the materiality of the information and the adequacy of the substitutions is not affected by whether the right is asserted under the Sixth Amendment or under the Fifth Amendment.

In analyzing whether to admit the information in the * * * * summaries, we are faced with a request to admit information where the declarants of the information are completely unavailable because of legitimate separation of powers reasons. "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). Thus, to the extent that the information gives Moussaoui an opportunity to defend against the Government's accusations, the materiality and favorability of the information remains relevant. I concur in Part IV.C.2.a through Part IV.C.2.c of my colleagues' opinion, which concludes that Moussaoui has made a sufficient showing that the information provided by the witnesses is material and favorable.

Given this conclusion and the fact that legitimate separation of powers reasons prohibit the defendant from having any access to the detainees, I believe that the Fifth Amendment's guarantee of a fundamentally fair trial gives Moussaoui the right to introduce at least some of this information at trial,[18] *see Roviaro v. United States*, 353 U.S.

---

[17]I respectfully disagree with the characterization of my analysis as "[a]pplication of *Chambers*." *Ante* at 30 n.17. Instead, this section addresses whether Moussaoui's overall due process right to a fundamentally fair trial includes a right to introduce the *information* at issue here —a right which Moussaoui has continuously asserted and a question that I believe is properly before this court.

[18]The same conclusion would not obtain in the immunity context because in those cases the defendant's inability to secure the witness's testimony results in part from the independent decision of the witness to invoke his Fifth Amendment privilege against self-incrimination. *Cf.*

53 (1957) (balancing the government's interest in withholding the identity of a confidential informant with the defendant's need for the information and holding that the defendant's need for the information defeated the government's interest in confidentiality); *Jencks v. United States*, 353 U.S. 657 (1957) (holding that the government may not withhold documents material to the defense on the grounds of confidentiality and continue to prosecute the defendant); *United States v. Fernandez*, 913 F.2d 148 (4th Cir. 1990) (holding that a finding that information is necessary to the defense defeats the government's asserted privilege), even if the form of that information does not comply in all respects with evidentiary rules, *see Chambers*, 410 U.S. 284 (holding that exclusion of evidence that was critical to the defense on the basis of traditional hearsay rules violated due process where statements had significant indications of reliability).[19] This is not to say that the summaries are admissible *in toto*. I agree with my colleagues that "Moussaoui should not be allowed to rely on obviously inadmissible statements (*e.g.,* statements resting on a witness' belief rather than his personal knowledge)." *Ante* at 23. Similarly, the district court retains the power to exclude irrelevant information and to require inclusion of additional portions of the summaries, over and above what Moussaoui seeks to introduce, in the interest of completeness. However, the Government may not, consistent with due process, rely on legitimate separation of powers principles to prohibit any access to the detainees, and at the same time, argue that the statements in the summaries that are based on personal knowledge are inadmissible because they were made out-of-court and not under oath.

---

*United States v. Mackey*, 117 F.3d 24, 28-29 (1st Cir. 1997) (analyzing under traditional hearsay rules the defendant's attempt to admit a witness's out-of-court statement after the witness invoked his Fifth Amendment privilege against self-incrimination and the court refused to compel the government to grant immunity).

[19]One might argue that this course of action gives Moussaoui more than he might receive under my colleagues' analysis. If access were granted and the witnesses refused to testify, Moussaoui would have no basis to seek admission of the information in the Government's possession. My approach protects the Executive's ability to conduct its war-making, military, and foreign relations duties, while at the same time allowing introduction of evidence in Moussaoui's favor.

Given that Moussaoui has a right to introduce the *information*, which is itself classified, I come to the issue of substitutions. I concur in Parts V.A through V.C of Chief Judge Wilkins's opinion, which direct the district court to aid the parties in crafting acceptable substitutes based on the * * * * summaries[20] and to give appropriate instructions to the jury regarding the source of the information.

### III.

In summary, I concur in Parts I and II of my colleagues' opinion. I dissent, however, from my colleagues' conclusion that separation of powers principles do not prohibit the district court from granting access to the witnesses. I do not believe that the district court had the authority to grant access to alien enemy combatants captured and detained overseas * * * * the goal of which is to protect American lives from future terrorist attacks. Because I concur in my colleagues' assessment of the materiality and favorability of the information provided * * * * which is found in Part IV.C.2.a through Part IV.C.2.c of their opinion, I would find that Moussaoui does have a right, grounded in due process, to introduce the material and favorable information provided by these detainees that are in the * * * * control of the United States because legitimate separation of powers principles prohibit access to the detainees. I also concur in Parts V.A through V.C of Chief Judge Wilkins's opinion, dealing with substitutions, to the extent that the analysis is not inconsistent with providing substitutions for the * * * * summaries.

---

[20]I would require substitutions for the * * * * summaries, while my colleagues would require substitutions for hypothetical deposition testimony. Because, in both cases, the information in the summaries is all that the district court and the parties have with which to craft substitutes, I do not believe that this difference appreciably affects the substitution analysis. In fact, the substitutions will necessarily be more similar to the * * * * summaries than they will be to hypothetical deposition testimony.

GREGORY, Circuit Judge, concurring in part and dissenting in part:

I concur with my colleagues' conclusion that the witnesses at issue in this appeal could provide material, favorable testimony on Moussaoui's behalf. I further concur with Chief Judge Wilkins' conclusion that the witnesses' overseas location does not preclude a finding that they are within the reach of the Compulsory Process Clause because they are, for purposes of this litigation, deemed to be in the custody of the United States.[1] I wholeheartedly agree with my colleagues that

---

[1]Contrary to the view Judge Williams expresses in her separate opinion, I cannot accept that Moussaoui's Sixth Amendment right of access may not exist because of separation of powers principles; this analysis places the cart before the horse. The Government's national security concerns do not preclude a finding that a criminal defendant in an Article III court is entitled to access witnesses; indeed, the whole of the Classified Information Procedures Act, 18 U.S.C.A. app. 3 (West 2000 & Supp. 2003), is premised on the theory that criminal defendants have rights of access, in some instances, to information deemed classified by the Executive branch, notwithstanding separation of powers principles. As CIPA recognizes, the Government's national security concerns may override a defendant's need for information to the extent that the courts may limit the form of access; this cannot be read to mean, though, that the defendant's constitutional rights cease to exist in the face of the Government's security considerations. Indeed, if Judge Williams' assessment were correct, we would be constrained to conclude that CIPA itself is an unconstitutional encroachment upon the Executive branch, as CIPA regulates, and, in the absence of a § 6(e) affidavit from the Attorney General, permits the Judiciary to order some form of disclosure of classified information in judicial proceedings even though the Executive branch has determined that the information must be protected based on national security concerns. *See* CIPA §§ 1, 5-8.

With all respect to Judge Williams, every criminal defendant in every Article III proceeding has a panoply of rights that we are duty-bound to protect, even in the face of the Government's interest in keeping sensitive or damaging evidence secure. *See, e.g., Chambers v. Mississippi*, 410 U.S. 294, 302 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."); *Washington v. Texas*, 388 U.S. 14, 19 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense . . . . This right is a fundamental element of due

the Government has an absolute right to refuse access to the witnesses on national security grounds; we shall not, indeed we must not, question the Government's determination that permitting the witnesses to be deposed would put our nation's security at risk. *See United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990) ("We are not asked, and we have no authority, to consider judgments made by the Attorney General concerning the extent to which the information in issue here implicates national security."). Further, as noted in the majority opinion, the district court correctly found that the proposed substitutions offered by the Government are not adequate to protect Moussaoui's right to a fair trial. However, as both the district court and the majority have recognized, the Government's refusal to comply with

---

process of law."). The defendant's rights may have to be satisfied by some means other than complete disclosure of the information at issue (or, in this case, complete access to the witnesses), but his rights do not evaporate simply because the Government's national security concerns make satisfying those rights more complicated than in the run-of-the-mill criminal prosecution. As we said in *United States v. Fernandez*, 913 F.2d 148 (4th Cir. 1990), "the government is simultaneously prosecuting the defendant and attempting to restrict his ability to use information that he feels is necessary to defend himself against the prosecution. Although CIPA contemplates that the use of classified information be streamlined, courts must not be remiss in protecting a defendant's right to a full and meaningful presentation of his claim to innocence." 913 F.2d at 154.

Judge Williams asserts that this recognition of the defendant's constitutional rights impinges on the Executive's ability to perform its duties with regard to war-making, national security, and foreign relations. However, the Executive is not compelled to comply with the district court's order to provide access to the witnesses. The Executive branch has in fact elected not to comply, as is its prerogative. In exchange for electing not to comply, there must be consequences, true; however, the consequences are, to a great degree, in the control of the Executive. It may choose to proceed with this prosecution under the limits imposed by the courts, or it may move the prosecution out of an Article III forum and into a military tribunal, or it may elect to drop some of the present charges, and may even indict Moussaoui on alternate charges for which the evidence in dispute would not be relevant. How to proceed with the prosecution is a matter for the Executive to decide; how to protect the integrity of the criminal proceedings is a matter for the Judiciary.

the district court's orders necessarily brings with it some consequences.[2] *See generally* CIPA § 6(e)(2) (providing for dismissal of indictment or other sanction upon Government's refusal to disclose classified information when ordered to do so by the district court);[3] *Jencks v. United States*, 353 U.S. 657, 670-71 (1957) (holding that the Government may "invoke its evidentiary privileges [to avoid public disclosure of highly sensitive material] only at the price of letting the defendant go free. . . . [S]ince the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.") (quoting *United States v. Reynolds*, 345 U.S. 1, 12 (1953)); *Fernandez*, 913 F.2d at 162-64 (affirming dismissal of indictment when Government elected not to disclose classified evidence that was material to the defense). It is in formulating the remedy for the Government's refusal to comply with the district court's order that I must part ways with the majority.[4]

The majority directs that the district court itself craft substitutions for the witnesses' potential testimony, using portions of the * * * * summaries designated by Moussaoui, subject to objection by the Gov-

---

[2]To be clear: The consequences resulting from the Government's noncompliance are not intended as a penalty upon the Government. Rather, they are a means of protecting the rights of the Defendant, and of protecting the integrity of these judicial proceedings.

[3]We have stated that this is not, strictly speaking, a CIPA case. *See United States v. Moussaoui*, 333 F.3d 509, 514-15 (4th Cir. 2003); *see also* slip op. at 22, n.12. Because the witnesses will not be deposed, we are now primarily concerned with the use of summaries of * * * * statements; these summaries are the sort of documents to which the CIPA is usually applied. Accordingly, this case has, in my view, moved more firmly into CIPA territory. My concurrence does not depend solely on CIPA as a basis for our jurisdiction, however; as the majority concludes, we have jurisdiction over this appeal pursuant to 18 U.S.C.A. § 3731 (West Supp. 2003).

[4]Under CIPA, the usual remedy for the Government's failure to comply with a district court's disclosure order is dismissal of the indictment. CIPA § 6(e)(2). However, like the majority and the district court, I believe that the ends of justice are best served by a circumspect exercise of discretion in creating an appropriate remedy.

ernment. The majority further instructs that only Moussaoui may admit into evidence, or elect not to admit, the substitutions, subject, of course, to the district court's ruling on admissibility. While I appreciate that the majority's solution to the difficult problem of ensuring Moussaoui's rights is an effort to put him as nearly as possible in the place where he would be if he were able to examine the witnesses, I respectfully suggest that this solution places the district court in a thoroughly untenable position. Moreover, this solution is contrary to CIPA's expectation that the Government shall provide proposed substitutions for classified information, and it essentially places the district court in the position of being an advocate in the proceedings.

The district court has stated, on the record, that the substitutions previously offered by the Government were necessarily flawed because they were inherently unreliable, particularly because the * * * * summaries used in formulating the substitutions were not made under oath, were taken in circumstances not designed to guarantee reliability, and were not responsive to questions posed by the defense. Although we may take issue with some of the concerns identified by the district court, by forcing that court to construct substitutions from the same summaries, we are asking the court to do something that it has stated cannot be done. It will be difficult—perhaps impossible—for the district court to credibly prepare substitutions that it would consider admissible given its prior findings on the reliability of the material from which the substitutions are to be drawn. We are also asking the district court to do something that is not anticipated, implicitly or explicitly, by CIPA. The Government, not the district court, is charged with preparing the substitutes; the court's role is to determine whether those substitutes are adequate to protect the defendant's rights. CIPA §§ 4, 6(c)(1); *see Fernandez*, 913 F.2d at 154. By asking the district court to prepare the substitutions, we are transferring to the court the authority that CIPA vests in the Government.

More importantly, as the Government argued in challenging the defense's proposed substitutions in the district court, and as that court found, the purpose of CIPA, or any other equitable remedy imposed by the courts, is not to offer the defendant a windfall to which he would not otherwise be entitled. If, as the majority instructs, the substitutions are based on Moussaoui's selections from the * * * * sum-

maries, subject to the Government's objection but not incorporating the Government's own selections, we may be giving the defense an opportunity to offer a distorted version of the witnesses' statements, a result clearly not contemplated by CIPA, nor intended by the majority.[5] Additionally, as the majority recognizes, "because many rulings on admissability—particularly those relating to relevance—can only be decided in the context of a trial, most of the witnesses' statements cannot meaningfully be assessed for admissibility at this time." (Slip op. at 23). Asking the district court to pick and choose from among the summaries to craft substitutions for Moussaoui's use before the Government's evidence is forecast is a risky proposition at best. The * * * * summaries paint a complete, if disjointed, picture of the statements made by the witnesses * * * *; if the summaries are to be used as a substitution for the witnesses' testimony, they should be used in their entirety, subject to the district court's trial rulings on admissibility of any given passage to which either party objects, whether on hearsay grounds, as cumulative, as unduly prejudicial, or upon any other evidentiary basis.

Additionally, I disagree with the majority's decision to vacate the district court's order striking the Government's death notice at this juncture.[6]

---

[5]I also expect that we are setting ourselves out as super-arbiters of the admission of evidence in this case. If the district court overrules an objection by the Government to Moussaoui's proffered materials for inclusion in the substitutions, for example, it is fair to assume that the Government might seek to appeal the district court's ruling. Conversely, if Moussaoui seeks inclusion of material but the district court sustains the Government's objection to the evidence, Moussaoui may seek to appeal. This court is not in a position to make evidentiary rulings; indeed, it is the district court's purview to do so. As the majority recognizes, the district court is far more familiar with the record and the facts of this case than are we. The construct proposed by the majority will, I fear, lead to unnecessary piecemeal review of the district court's rulings with regard to the substitutions it has been tasked to prepare, a review we are ill-equipped to conduct.

[6]The majority leaves open the possibility that if the substitutions crafted by the district court are inadequate, or if the jury is not properly instructed as to the circumstances of the substitutions and their reliabil-

In a prosecution under the Federal Death Penalty Act, l8 U.S.C.A. § 3591-3598 (West 2000 & Supp. 2003), the fact finder is required to consider whether any mitigating factors weigh against imposing a sentence of death. One potential mitigating factor specifically identified in the Act is the defendant's role in the offense:

> (a)  Mitigating factors.—In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following:
>
> . . .
>
> (3)  Minor participation.—The defendant is punishable as a principal in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.

18 U.S.C.A. § 3592(a)(3). In other words, if a defendant is guilty of an offense, but played a small part in it, the jury (or, in a bench trial, the judge) could find that he was not sufficiently culpable to warrant the imposition of the death penalty.

Moussaoui argues that the witnesses could offer testimony that would show he did not participate in an act that directly resulted in death: they would testify, he contends, that he did not have an active role in the planned September 11 attack, nor did he know of the plan and fail to disclose that knowledge to investigators, who might have been able to use that knowledge to prevent the attack, when he was

---

ity, the death notice could be stricken and other sanctions could be imposed. In my view, however, Moussaoui's inability to question the witnesses critically impairs his ability to prepare a defense, particularly (though not solely) as to a potential death sentence. Accordingly, as explained more fully below, if Moussaoui must proceed to trial on the basis of substitutions rather than the witnesses' testimony, as we all agree he must, the death penalty should be removed from the range of possible sentences Moussaoui may face.

taken into custody and questioned prior to the attack. Moussaoui's theory of the case, as we understand it, is that even though he is a member of al Qaeda who has pledged his allegiance to Osama bin Laden, and even though he was willing to engage in terrorist acts, and was indeed training to participate in terrorist acts, he was not involved in the terrorist acts that occurred on September 11, 2001, nor did he know of the plans before the attack took place. Instead, his participation was to involve later attacks, attacks that may or may not have been planned to occur in the United States or against this country's interests abroad. We cannot know to any degree of certainty whether the witnesses at issue would absolve Moussaoui of any responsibility for any part of the September 11 operation, or knowledge of the planned attack, nor do we know if a jury would find credible any such testimony. However, because the Government has exercised its right to preclude Moussaoui from examining the witnesses, and based on the * * * * summaries in the present record, we must assume for present purposes that they would so testify.

Even if Moussaoui is permitted to admit substitutions derived from the * * * * summaries, those substitutions cannot be considered a functional equivalent of live (or deposition) testimony, nor are they adequate or sufficient to substitute for testimony. *Cf. Old Chief v. United States*, 519 U.S. 172, 187-89 (1997) (recognizing that stipulation "may be no match for the robust evidence that would be used to prove" the stipulated fact). Because the summaries are not responses to the questions that Moussaoui would ask if given the opportunity to depose the witnesses, and because the jury will not be able to see the witnesses and judge their credibility, use of the summaries will necessarily place severe limits on the evidence Moussaoui can present in his defense, particularly during the penalty phase of a capital proceeding. The ultimate question that must be resolved to determine whether Moussaoui is eligible for the death penalty is this: Did he participate in the September 11 attack, or know of the attack in advance? If Moussaoui cannot ask this question of the witnesses who have direct knowledge, he is undeniably and irretrievably handicapped in his ability to defend himself from a sentence of death. The Government may argue that no one, other than Moussaoui himself, has stated he was not involved. Moussaoui has no access to those who could exonerate him from death eligibility, and the jury will not have any evidence upon which to base a finding in this regard except, possibly, for

Moussaoui's own testimony, which he is not obligated to provide. Moussaoui will not be able to offer the most relevant evidence with which he might be able to avoid the death penalty.

To leave open the possibility of a sentence of death given these constraints on Moussaoui's ability to defend himself would, in my view, subvert the well-established rule that a defendant cannot be sentenced to death if the jury is precluded from considering mitigating evidence pertaining to the defendant's role in the offense. *See, e.g., Lockett v. Ohio*, 439 U.S. 586, 604, 608 (1978). *See also Skipper v. South Carolina*, 476 U.S. 1, 5 (1986); *United States v. Jackson*, 327 F.3d 273, 299 (4th Cir. 2003) ("During sentencing in a capital case, the factfinder may 'not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'") (quoting *Lockett*, 438 U.S. at 604). A sentence of death requires "a greater degree of reliability" than any lesser sentence. *Lockett*, 438 U.S. at 604 (citing *Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976)).

Here, the reliability of a death sentence would be significantly impaired by the limitations on the evidence available for Moussaoui's use in proving mitigating factors (if he is found guilty). Although it has been repeated often enough to have the ring of cliche, death *is* different. It is the ultimate penalty, and once carried out, it is irrevocable. A sentence of death cannot be imposed unless the defendant has been accorded the opportunity to defend himself fully; it cannot be imposed without the utmost certainty, the fundamental belief in the fairness of the result. Because Moussaoui will not have access to the witnesses who could answer the question of his involvement, he should not face the ultimate penalty of death. Accordingly, I would uphold the district court's sanction to the extent that it struck the Government's death notice. On this basis, I must dissent.