**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Iyman FARIS, Defendant–Appellant.**

No. 03–4865.

United States Court of Appeals, Fourth Circuit.

Argued: June 4, 2004.

Decided: July 19, 2004.[*]

\* Withdrawn and Republished at 388 F.3d 452.

David Benjamin Smith, English & Smith, Alexandria, Virginia, for Appellant.

Joseph Nicholas Kaster, Criminal Division, United States Department of Justice, Washington, D.C., for Appellee.

Paul J. McNulty, United States Attorney, Neil Hammerstrom, Jr., Assistant United States Attorney, Office of the United States Attorney, Alexandria, Virginia, for Appellee.

Before WILKINS, Chief Judge, and NIEMEYER and TRAXLER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Iyman Faris appeals the denial of his motion to withdraw his guilty plea. We affirm.

## I.

### A.

Faris, a native of Kashmir, moved to the United States in 1994 and became an American citizen in 1999. Beginning in March 2003, he gave a series of statements to the Federal Bureau of Investigation (FBI) describing his contacts with members of al Qaeda. These statements were given while Faris was sequestered in a hotel in Columbus, Ohio, and at the FBI compound in Quantico, Virginia.

As a result of these statements, Faris was charged with providing material support to a foreign terrorist organization, see 18 U.S.C.A. § 2339A (West Supp.2004), and conspiring to provide material support to a foreign terrorist organization, see 18 U.S.C.A. § 371 (West 2000). He pled guilty to both offenses and signed a writ-ten statement of facts (SOF) outlining the conduct supporting the charges. At the plea hearing, Faris stipulated under oath that the allegations in the SOF were "true and accurate." J.A. 41.

Information relating to Faris and his guilty plea was placed under seal. After the plea was taken, however, the Government moved to unseal the file in order to respond to "erroneous reporting." Id. at 144. The district court granted this motion.

Nearly five months after Faris pled guilty, he moved to withdraw his plea. In support of this motion, he cited a summary of his statements to the FBI ("the FBI 302"); the statements were given prior to the plea, but the summary was prepared afterward. Faris alleged that the FBI 302 contradicted the SOF in important respects and that, because both documents were ostensibly derived from the same statements, these contradictions vitiated the factual basis for his plea. The district court denied this motion. At the same hearing, the court sentenced Faris to 20 years imprisonment. This appeal followed.

### B.

To understand the issues Faris raises on appeal, it is helpful to examine the SOF and review the reasons why Faris claims that the SOF is inconsistent with the FBI 302.

According to the SOF, Faris' close friend C-1[1] took Faris to an al Qaeda training camp in late 2000. While there, Faris met Osama bin Laden and discussed ultralight aircraft with another al Qaeda member (probably C-2), who asked Faris

1. The SOF refers to two alleged co-conspirators as "C-1" and "C-2." J.A. 66, 67. Both of these people are identified by name in the FBI 302. We will not disclose those identities in this opinion, as we perceive no need to do so. It is, however, necessary to acknowledge that the "bridge in New York City" mentioned in the SOF is the Brooklyn Bridge. Id. at 68.

to obtain information on this subject. Although all of this information is reflected in the FBI 302, Faris maintains that the FBI 302 is internally inconsistent because it states that "FARIS denied ever attending an Al–Qaeda training camp." J.A. 190, 197.

The SOF states that Faris had numerous contacts with C–1 and C–2 after his visit to the training camp. The SOF further recounts that Faris performed four tasks on behalf of al Qaeda. As explained below, Faris contends that material in the FBI 302 casts doubt on some of these recitations.

*First,* the SOF states that Faris researched ultralight airplanes on the Internet and printed out some information, which he then gave to C–1 for use by al Qaeda. The same basic account appears in the FBI 302, but it is arguably contradicted by other statements within that document. Specifically, the FBI 302 states that, well after Faris completed his online research, C–2 asked Faris why he had not provided information about ultralight aircraft, and Faris replied, "[W]hat's there to give, look it up on the internet." *Id.* at 174 (internal quotation marks omitted).

*Second,* the SOF says that Faris "accompanied C–1 to a factory where they ordered 2,000 lightweight sleeping bags that were shipped to Afghanistan for use by Osama bin Laden and al Qaeda." *Id.* at 67. Faris maintains that this description overstates his role in the transaction, and that the FBI 302 more accurately indicates that Faris was merely present when C–1 placed this order.

*Third,* both the SOF and the FBI 302 describe an incident in which Faris helped C–1 obtain extensions on airline tickets for use by al Qaeda members. Faris does not assert that these accounts are inconsistent, but he has alleged since pleading guilty

that C–1's assistant in this venture was C–1's son, not Faris.

*Fourth,* the SOF states that Faris and C–2 discussed the possibility of using "gas cutters" to sever suspension cables on the Brooklyn Bridge. *Id.* at 68 (internal quotation marks omitted). According to the SOF, Faris "approached an acquaintance who had a technical background and asked him about obtaining 'gas cutters.'" *Id.* at 69. Later, Faris went to New York City, examined the bridge, and concluded that C–2's plan was not feasible. He conveyed this conclusion to C–1 with a coded message stating that "the weather is too hot." *Id.* at 69 (internal quotation marks omitted). The FBI 302 describes the incident involving the gas cutters somewhat differently; it states that Faris and his friend discussed how gas cutters work, without indicating that Faris asked how to acquire a gas cutter. As for the Brooklyn Bridge and the ensuing message to C–1, the FBI 302 contains the following account of a trip Faris allegedly took to New York City while working as a truck driver:

> On February 25, 2003, while on his way to deliver sporting goods to Buffalo, NY, FARIS looked at the Brooklyn Bridge and concluded that it would be impossible to take down the bridge because of the construction of the bridge, as well as the amount of traffic on the bridge. FARIS called [a person capable of relaying messages] and told him to pass a message to [C–2] that "the weather is too hot here". FARIS said that [C–2] did not tell him to use "hot" and/or "cold" as code words and that he made up the code "the weather is too hot" and assumed that [C–2] would understand what it meant.

*Id.* at 193. Another interview report also described the incident:

> FARIS advised that the surveillance took place on his last trip to Brooklyn,

during the winter of 2003. FARIS advised that he did not take any photos or video of the Brooklyn Bridge, just drove over it and assessed it during the drive.

*Id.* at 208. In Faris' motion to withdraw his plea, defense counsel represented that, upon investigation, he concluded that Faris could not have driven his truck across the Brooklyn Bridge because tractor-trailers are not allowed on that bridge.

## II.

Faris' primary claim on appeal is that the district court erred in denying his motion to withdraw his plea based on the information in the FBI 302. Prior to sentencing, a defendant may withdraw a guilty plea upon showing "a fair and just reason." Fed.R.Crim.P. 11(d)(2)(B). We have identified six factors ("the *Moore* factors") that are useful in determining whether to permit a defendant to withdraw a guilty plea:

> (1) whether the defendant has offered credible evidence that his plea was not knowing or not voluntary, (2) whether the defendant has credibly asserted his legal innocence, (3) whether there has been a delay between the entering of the plea and the filing of the motion, (4) whether defendant has had close assistance of competent counsel, (5) whether withdrawal will cause prejudice to the government, and (6) whether it will inconvenience the court and waste judicial resources.

*United States v. Sparks,* 67 F.3d 1145, 1150 (4th Cir.1995) (quoting *United States v. Moore,* 931 F.2d 245, 248 (4th Cir.1991)). The most important of these factors is the first one, which addresses the question of whether the waiver colloquy was properly

conducted. *See United States v. Wilson,* 81 F.3d 1300, 1305–07 (4th Cir.1996).

The district court concluded that all of the *Moore* factors weighed against Faris' motion, with the possible exception of the third (delay). We review this ruling for abuse of discretion. *See Sparks,* 67 F.3d at 1150.

### A. *Knowing and Voluntary Plea*

■ After reviewing the transcript from the plea hearing multiple times, the district court concluded that Faris' responses during the waiver colloquy demonstrated that he understood the consequences of his plea and that he entered the plea voluntarily. This conclusion is amply supported by the transcript, which reflects that the court thoroughly explained to Faris the facts he would admit by pleading guilty, the rights he would waive, and the sentence he would face. Faris' statements in response to these explanations demonstrate that he understood the information he was being given.

Faris nevertheless claims that his plea was involuntary because (1) he had been threatened with deportation to the American detention facility at Guantanamo Bay, (2) he had been advised that he could expect a sentence of only 10 years, and (3) he had a history of depression that may have been exacerbated by his sequestration preceding his guilty plea. The last of these claims is unavailing in light of a postplea psychiatric evaluation confirming that Faris was mentally competent notwithstanding the stress of recent events. As for the claim that Faris was promised a lenient sentence, Faris specifically averred during the plea colloquy that nobody made any promises other than those in the plea agreement, and the record contains no evidence to the contrary.[2]

---

**2.** Faris' brief candidly admits that Faris never introduced evidence that he was promised a

reduced sentence. While we commend counsel for his candor, it is not proper to present

The assertion that the Government threatened to send Faris to Guantanamo Bay is not entirely unsupported; rather, defense counsel made three references to Guantanamo during the hearing on the motion to withdraw the guilty plea. We are not inclined to give effect to these references, however, as they are contradicted by Faris' sworn testimony at the plea colloquy, as well as the signatures of both Faris and his attorney on the plea agreement, which specifically states that "[t]he defendant acknowledges that no threats have been made against him." J.A. 63.

Furthermore, even if Faris was told that he could be sent to Guantanamo if he did not plead guilty, this would not undermine the voluntariness of his plea. Every guilty plea necessarily entails a choice among distasteful options. For this reason, courts have held that a guilty plea is not rendered involuntary merely because it was entered to avoid harsh alternatives such as the death penalty, *see Brady v. United States*, 397 U.S. 742, 749–50, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); prosecution on additional charges, *see Bordenkircher v. Hayes*, 434 U.S. 357, 363–65, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978); or expulsion from the witness protection program, *see Doe v. United States*, 51 F.3d 693, 702 (7th Cir.1995).[3] Thus, the district court did not abuse its discretion in concluding that the first—and most important—of the relevant factors weighed against Faris' motion to withdraw.

### B. *Credible Assertion of Innocence*

■ Faris next contends that his assertions of innocence were credible because the FBI 302 cast doubt on the veracity of the SOF. The district court was not persuaded, in light of (1) the overall consistency between the FBI 302 and the SOF and (2) the strong weight to be accorded Faris' sworn statements during the plea hearing. We find no abuse of discretion.

Faris relies heavily on the alleged impossibility of his claim that he examined the Brooklyn Bridge while driving over it. There is nothing impossible about this claim, however. No evidence specifically indicates that Faris drove across the Brooklyn Bridge in his truck. In light of the possibility that he used another vehicle, as well as his multiple attestations that he had in fact examined the bridge, the district court properly discounted Faris' post-plea denials.

Neither do the other putative inconsistencies between the SOF and the FBI 302 offer a meaningful suggestion of innocence. For example, Faris could easily have visited an al Qaeda training camp without actually "attending" such a camp in order to receive training; indeed, the FBI 302 indicates that this is exactly what occurred. And, even to the extent that some discrepancies exist, all of Faris' statements about his assistance to al Qaeda operatives are ultimately inculpatory. Thus, they do not establish that Faris is legally innocent.

Faris contends that the district court should have conducted a hearing to resolve

allegations in a brief that are not supported by the record, and we will not consider such allegations in deciding this appeal.

3. Faris contends that sending him to Guantanamo Bay would have been unlawful under *Padilla v. Rumsfeld*, 352 F.3d 695, 724 (2d Cir.2003), *rev'd on other grounds*, —— U.S. ——, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004),

which held that the detention of American citizens as enemy combatants is barred by 18 U.S.C.A. § 4001(a) (West 2000). This does not persuace us that threats to send Faris to Guantanamo were necessarily improper, because, *inter alia*, *Padilla* was decided after Faris pled guilty; thus, there was no precedent precluding a transfer to Guantanamo at the time of Faris' guilty plea.

any factual disputes between the SOF and the FBI 302, but he never requested a hearing below. Moreover, even on appeal Faris has not indicated what evidence he would present at such a hearing. *See United States v. Moore,* 931 F.2d 245, 247–48 (4th Cir.1991) (holding that request for hearing was not well-taken in absence of proffer). Accordingly, the district court did not abuse its discretion in failing to conduct a hearing.

## C. *Delay*

■ Faris filed his motion to withdraw his guilty plea nearly five months after he entered the plea. He contends, however, that only a small portion of this time should be imputed to him, because the delay was caused by the Government's failure to disclose the FBI 302. The Government disagrees, asserting that this delay was lengthy and that Faris was responsible for all of it.

The district court found it unnecessary to resolve this dispute because the other five factors weighed against Faris' motion to withdraw; thus, even in the absence of delay, Faris was not entitled to withdraw his plea. It was well within the discretion

of the district court to leave this question open. *See Sparks,* 67 F.3d at 1154 (noting that it is not necessary for district court to consider all six *Moore* factors).

## D. *Close Assistance of Counsel*

■ The district court held that Faris received "close assistance of an extremely experienced criminal defense attorney." J.A. 117. Faris concedes that his attorney (Sinclair) is very competent but nevertheless asserts that he did not receive close assistance because (1) Sinclair misled him by informing him that he could be sent to Guantanamo Bay if he did not plead guilty, and (2) Sinclair's representation was impaired by the Government's failure to disclose information necessary to provide competent representation—specifically, the FBI 302. We do not agree.

In general, a defendant seeking to establish that he is entitled to withdraw his plea because he did not receive close assistance of counsel must demonstrate that counsel performed deficiently and that, but for counsel's errors, the defendant would not have pled guilty and would instead have insisted on proceeding to trial.[4] *See United States v. Bowman,* 348 F.3d 408,

---

**4.** This standard derives from the test for ineffective assistance of counsel set forth in *Hill v. Lockhart,* 474 U.S. 52, 58–59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), which relied in turn on the standards announced in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In unusual circumstances, a defendant may obtain reversal of his conviction based on the inadequacy of counsel even in the absence of a showing that would satisfy *Hill* or *Strickland. See United States v. Cronic,* 466 U.S. 648, 659–60, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (stating that a defendant may obtain relief based on the inadequacy of counsel without showing prejudice if, under all the circumstances, "the likelihood that any lawyer ... could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial").

Assuming *arguendo* that some *Cronic*-like standard applies in the context of plea withdrawals, we do not believe any such standard is satisfied here. Faris contends that it was impossible for Sinclair to provide adequate assistance without the FBI 302 because, in Sinclair's own words, the FBI 302 would have made Sinclair "far more inquisitive of Mr. Faris as to what was true." J.A. 95. But the person who should have known what was true was Faris himself, and it was certainly not impossible for Faris to identify for Sinclair any inaccuracies in the SOF. Accordingly, we cannot conclude that, under all the relevant circumstances, the late disclosure of the FBI 302 so impeded Sinclair's representation of Faris that Faris could not possibly have received close assistance of counsel during the plea proceedings.

416 (4th Cir.2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 1523, 158 L.Ed.2d 166 (2004). Faris' first argument—that counsel erroneously advised him that he could be removed to Guantanamo Bay—is unavailing because Faris pled guilty before the Second Circuit reached its decision barring the Government from applying the enemy combatant designation to American citizens captured on American soil. *See supra* note 3. Faris' second argument—concerning the Government's failure to disclose the FBI 302—likewise fails, as it does not even allege any dereliction by counsel.

### E. *Prejudice to the Government*

■ The district court found that the Government would be prejudiced by withdrawal of Faris' plea. The court reasoned, "[G]iven the sensitive nature of some of the witnesses who might be relevant to this case and the issues that we are well aware of from the *Moussaoui* case, it would clearly be a problem if this case had to go to trial." [5] J.A. 117.

Faris contends that these concerns do not constitute prejudice for purposes of this inquiry. We agree. The Government may not show prejudice by relying on the costs that would inevitably attend the trial of a particular case even in the absence of a withdrawn guilty plea. *See United States v. Valdez,* 362 F.3d 903, 913 (6th Cir.2004). Instead, the Government must identify some costs specifically resulting from the entry and subsequent withdrawal of the plea. *See, e.g., United States v. Morrison,* 967 F.2d 264, 269 (8th Cir.1992) (holding that withdrawal of a plea entered on the eve of trial would be prejudicial

because it would require the victim to undergo a second round of potentially traumatic trial preparation).

The Government did not identify any prejudice of this nature during district court proceedings, and the district court did not find that any such prejudice existed. Accordingly, the prejudice factor should be deemed neutral instead of being weighed against Faris' motion to withdraw.

### F. *Inconvenience and Waste of Resources*

■ With respect to inconvenience and waste of resources, the district court noted that "scarce ... funds ... were used to hire a psychiatrist to examine the defendant. A probation officer prepared a pre-sentence report. The government's been required to file papers on this issue. There is inconvenience to the Court already, and it would be a complete waste of judicial resources for this matter to go forward." J.A. 117. Faris disputes each of these grounds.

We are inclined to agree that the district court should not have considered the burdens associated with the probation officer's preparation of the pre-sentence report or the Government's submission of a response to Faris' motion. These are routine requirements that arise in most criminal cases (the pre-sentence report), or at least in most cases in which the defendant seeks to withdraw a guilty plea (the response to the motion). Thus, giving these events significant weight would unduly enhance the already formidable obstacles to withdrawal of a guilty plea.

---

**5.** The *Moussaoui* case also involves an alleged al Qaeda member and is pending before the same district judge who accepted Faris' plea. That case has engendered significant litigation relating to Moussaoui's desire to contact certain witnesses allegedly detained by the United States government. *See generally United States v. Moussaoui,* 365 F.3d 292 (4th Cir.2004).

■ As to other matters, however, we find no abuse of discretion. For example, as the district court noted, Faris' antics after he entered his plea—including banging his head against a wall during a post-plea debriefing—induced the court to authorize a psychiatric evaluation. The psychiatrist not only deemed Faris competent but also noted that Faris' "mix of impetucusness and calculation ... makes judging his motivations ... most difficult." *Id.* at 222. Under the circumstances, the court could reasonably conclude that Faris had manipulated the system in a wasteful manner.

Furthermore, the court did not abuse its discretion in concluding that it would waste resources to vacate Faris' plea and allow his case to proceed to trial. Faris had already made credible admissions of guilt. Thus, contrary to his assertion on appeal, he had no legitimate interest in withdrawing his guilty plea to test the possibility of acquittal at trial. It follows that the district court properly concluded that the final *Moore* factor counted against Faris, although the court may have accorded this factor too much weight in light of some of the considerations we have deemed inappropriate.

### G. *Conclusion*

■ For the reasons stated above, we hold that the district court properly exercised its discretion with respect to the first four factors, finding that one of them—delay—was neutral and that the other three—including the most important factor—weighed against Faris. We disagree, however, with the finding of the district court as to prejudice, and we conclude that the court may have given undue weight to the possibility of inconvenience and waste of resources.

If this were a close case, our determination that the district court erred in two respects would necessitate a remand. No further proceedings are required here, however, because our holding could not alter the overall balance of the six *Moore* factors. The district court found that five of these factors militated against permitting Faris to withdraw his plea and that the remaining factor was neutral. The effect of our holding is to reduce the weight on the side of denying Faris' motion. However, the district court did not place *any* weight on the other side of the scale, and we do not hold that it should have done so. Thus, even though the district court weighed certain factors incorrectly, its overall decision was proper and must be upheld.

### III.

Faris makes two additional claims: First, he asserts that he was entitled to withdraw his plea because the Government breached its promise to keep the agreement sealed. Second, he claims that the failure to deliver the FBI 302 to the defense prior to the plea hearing—or at least notify him of the substance of the report—violated the prosecutor's duty to disclose exculpatory evidence pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny.

Because Faris did not raise either of these claims in the district court, we review both for plain error. *See* Fed. R.Crim.P. 52(b); *United States v. Olano,* 507 U.S. 725, 731–32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). To establish plain error, Faris must show that an error occurred, that the error was plain, and that the error affected his substantial rights. *See Olano,* 507 U.S. at 732, 113 S.Ct. 1770; *see also United States v. Dominguez Benitez,* —— U.S. ——, ——, 124 S.Ct. 2333, 2340, 159 L.Ed.2d 157 (2004) (holding that in the guilty plea context, an error affects substantial rights if there is "a reasonable

probability that, but for the error, [the defendant] would not have entered the plea"). Even if Faris makes this three-part showing, correction of the error remains within our discretion, which we "should not exercise ... unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Olano,* 507 U.S. at 732, 113 S.Ct. 1770 (alteration and internal quotation marks omitted).

Regarding the alleged breach of the plea agreement, we find no error whatsoever. Faris' plea agreement does not contain any promise to maintain the confidentiality of the proceedings. Instead, the agreement includes a recognition that Faris' cooperation might place Faris or his family at risk, and further provides that, under appropriate circumstances, the Government will "take steps that it determines to be reasonable and necessary to attempt to ensure [Faris'] safety and that of his family." J.A. 62. Because there was no promise to keep the proceedings themselves secret, the Government did not breach the plea agreement by moving to unseal the proceedings.[6]

We also find that no *Brady* violation occurred. The FBI 302 was nothing more than a summary of Faris' own statements. Thus, if the SOF was inaccurate or incomplete in any respect, Faris should have been able to recognize this without recourse to the FBI 302. Because the contents of the FBI 302 were already known to Faris, the failure to disclose this report did not violate *Brady. See Allen v. Lee,* 366 F.3d 319, 324–25 (4th Cir.2004) (en banc) (finding no *Brady* violation based on failure to disclose records of medications administered to defendant because

defendant had personal knowledge of such medications).

In any event, as discussed above, the FBI 302 did not meaningfully contradict the SOF. We therefore agree with the district court that the FBI 302 does not create substantial doubt about the reliability of the statements in the SOF. Accordingly, the failure to disclose the FBI 302 (or its substance) did not violate *Brady* because that report did not constitute exculpatory material unavailable to the defense.

### IV.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

---

**6.** Faris characterizes this promise as "implied," Br. of Appellant at 30, but his written agreement with the Government contains a merger clause stipulating that "[t]he United States has made no promises or representations except as set forth in writing in this plea agreement," J.A. 63.